In the

# United States Court of Appeals
## For the Seventh Circuit

No. 22-1485

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JEREMY OUTLAND,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:17-cr-30073 — **Sue E. Myerscough**, *Judge.*

ARGUED FEBRUARY 16, 2023 — DECIDED JULY 11, 2023

Before RIPPLE, SCUDDER, and ST. EVE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* In November 2017, Jeremy Outland
was arrested and charged with distributing heroin. He later
moved to suppress incriminating statements that he had
made to the police on the grounds that his statements were
not voluntary and that he had not knowingly and intelligently
waived his *Miranda* rights. The district court denied his sup-
pression motion, and Mr. Outland entered a conditional plea
of guilty, reserving the right to appeal the denial of his

motion. On appeal, we held that the district court failed to determine whether Mr. Outland had knowingly and intelligently waived his *Miranda* rights, instead focusing solely on the voluntariness of his statements. *See United States v. Outland*, 993 F.3d 1017 (7th Cir. 2021) ("*Outland I*"). We remanded to permit the district court to make the omitted determination. On remand, the district court decided that Mr. Outland had knowingly and intelligently waived his *Miranda* rights. Mr. Outland now appeals that determination. We affirm the judgment of the district court.

## I

## A

On November 21, 2017, after confidential sources informed law enforcement officers that Mr. Outland was involved in drug trafficking, Springfield Police Officer Daniel Weiss obtained a warrant to search Mr. Outland's person and residence for heroin and drug paraphernalia. Around 10:00 a.m., another Springfield police officer conducted a traffic stop and search of Mr. Outland. The officer discovered drug paraphernalia, read Mr. Outland his *Miranda* rights, and began transporting him to a Drug Enforcement Administration facility. During the drive, the officer noticed white powder in the back seat of his squad car and saw Mr. Outland collapse. Mr. Outland's face and coat were covered in a white substance, which later tested positive as heroin. The officer changed course and drove Mr. Outland to the emergency room.

Mr. Outland was unresponsive when triaged at approximately 10:46 a.m. Hospital staff began administering medications to counter the effects of his heroin overdose. A nurse

noted at 10:51 a.m. that Mr. Outland was "responsive" and "alert" after receiving Narcan and Zofran.[1] At 11:07 a.m., he passed swallowing tests for water and applesauce but was unable to swallow a cracker. Mr. Outland's condition deteriorated at 11:10 a.m. He was "very hard to arouse" and exhibited slurred speech and poor eye contact.[2] His condition remained unchanged at 11:20 a.m. But around 11:30 a.m., Mr. Outland passed swallowing tests for water, applesauce, and a cracker. Although he continued to appear drowsy and was having apneic episodes, hospital staff noted that he was alert, awake, and oriented and that his "mentation" was "improved significantly."[3]

At 12:13 p.m., hospital staff again described Mr. Outland as alert, awake, and oriented. They noted that he could follow commands and that his behavior was appropriate, calm, and cooperative. Hospital records reveal that he was speaking with a police officer at that time. Nonetheless, Mr. Outland remained subject to close medical observation. He was placed on a Narcan drip and awaited a bed in the intensive care unit for closer monitoring.[4] In notes at 12:59 p.m., 1:45 p.m., and 2:30 p.m., staff continued to describe Mr. Outland as alert, awake, and oriented.

---

[1] R.26-7 at 2.

[2] *Id.* at 3.

[3] *Id.* at 4–5.

[4] By the time he was placed on the Narcan drip, Mr. Outland had received 5 mg of Narcan, 50 mg of Revia, and 4 mg of Zofran.

Officer Weiss arrived at the hospital around 1:00 p.m. to interview Mr. Outland. According to Weiss, the officer assigned to Mr. Outland's room notified him that Mr. Outland had asked to speak with him. Weiss and another officer began the interview around 1:16 p.m., while Mr. Outland was still in an emergency room bed. Mr. Outland stated his name and date of birth, and Weiss read him his *Miranda* rights and confirmed that he understood his rights. During the interview, Mr. Outland proceeded to make several incriminating statements about trafficking in heroin. Mr. Outland was discharged two days later against medical advice.

**B**

Mr. Outland was subsequently charged with distributing and conspiring to distribute 100 grams or more of heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)–(C), and 846. He moved to suppress his statements from the hospital interview based on the "twofold contention that he 'was so intoxicated as to render his statement involuntary' and that 'he was unable to voluntarily and knowingly waive his *Miranda* rights based upon a long list of medications he was under at the time.'" *Outland I*, 993 F.3d at 1020. The district court held an evidentiary hearing at which it heard testimony from Mr. Outland, Weiss, and a DEA agent. Mr. Outland testified that his memory of his time in the hospital was "[v]ague[]" due to "the influence of drugs and medication," that he did not request to speak with Weiss, that he was in and out of consciousness prior to the interview, and that he felt coerced into giving the interview.[5] Weiss testified that Mr. Outland had requested to speak with him, that he "could tell that he

---

[5] R.66 at 44–50.

was … maybe under the influence of heroin" but was "not nodding off," and that Mr. Outland "was very coherent during the interview and gave us a lot of details; very, very specific details."[6]

The district court denied the suppression motion. "[F]ocusing exclusively on the voluntariness of [Mr. Outland's] statements," the court found no evidence of police coercion and credited Weiss's testimony that Mr. Outland had asked to speak with law enforcement. *Outland I*, 993 F.3d at 1020. Mr. Outland entered a conditional plea of guilty and reserved the right to appeal the denial of his motion. *Id.* at 1021.

On appeal, we held that the district court failed to address completely the validity of Mr. Outland's *Miranda* waiver. Mr. Outland's challenge presented "two separate questions: whether he received and validly waived his *Miranda* rights, and whether his statements themselves were voluntary." *Id.* We did not take issue with the district court's analysis concerning voluntariness, but we were concerned that "nowhere in its order did the district court make any finding as to whether Outland knowingly and intelligently waived his *Miranda* rights before the interview began." *Id.* at 1022. We declined to make such a finding in the first instance and remanded "for the limited purpose of allowing the district court to make such a determination." *Id.* at 1023. We suggested that the district court do so based on the existing record unless a compelling reason counseled otherwise. *Id.* at 1023–24.

After our remand, the district court ordered the parties to submit supplemental briefs with proposed findings of fact

---

[6] *Id.* at 29–30.

relevant to the validity of Mr. Outland's *Miranda* waiver. In March 2022, the district court again denied Mr. Outland's suppression motion. The court explained that intoxication can but does not necessarily affect the validity of a *Miranda* waiver and that the question whether a defendant was too intoxicated to execute a valid waiver is one of fact. The court noted that, in making its determination, it would rely primarily on the audio recording of the hospital interview, Mr. Outland's medical records, and Weiss's testimony at the evidentiary hearing. The court stated that it would not rely on Mr. Outland's testimony "regarding his state of mind" because it found his testimony on that point not credible.[7]

In the district court's view, Weiss's testimony at the evidentiary hearing was probative of Mr. Outland's mental presence. Weiss testified that Mr. Outland was "very coherent during the interview" and provided "a lot of details; very, very specific details."[8] Weiss also noted that Mr. Outland "had a lot of modulation in his voice," adjusting it depending

---

[7] R.80 at 11. The court gave two reasons for this credibility finding. First, at the hearing, Mr. Outland denied having possessed or swallowed heroin in the back seat of the squad car and claimed that he overdosed because he had used heroin early in the morning on the day of the arrest. *Id.* That claim, the court found, was "plainly false" and was contradicted by the statements recorded in the hospital interview and by Mr. Outland's own motion to suppress, which stated that he "ingested a large quantity of heroin." *Id.* (citing R.26 at 18). Second, the court found that Mr. Outland's demeanor in the evidentiary hearing gave it reason to deem his "other self-serving statements" not credible. *Id.*

[8] *Id.* at 12 (quoting R.66 at 30).

on his level of excitement.[9] He also stated that Mr. Outland had requested to speak with him. The court observed that this testimony was consistent with the medical records, which showed that by 12:13 p.m.—about an hour before the interview—Mr. Outland was wide awake, alert, responsive, and oriented. The records showed that Mr. Outland's condition remained consistent thereafter. And although Mr. Outland had been administered several medications, these were designed to counteract the effects of his heroin overdose and so would not have "impair[ed] [his] ability to understand his *Miranda* rights."[10] The court recognized that the medications could entail side effects affecting state of mind, but it saw no signs in the medical records of "any negative side effects whatsoever."[11]

Finally, the court credited Weiss's testimony that Mr. Outland had requested to speak with him. It found Mr. Outland's "emphatic insistence that he did not request an interview" to be "inconsistent with [his] insistence elsewhere in his testimony that his memory of his actions [at the hospital] [wa]s incomplete."[12]

In sum, the court recognized that "the stress and other psychological effects of a recent overdose may have had some impact on [Mr. Outland's] cognitive capacity," but it concluded that "he was not so overcome by his circumstances

---

[9] *Id.* (quoting R.66 at 30).

[10] *Id.* at 13.

[11] *Id.* at 13–14.

[12] *Id.* at 16 (citing R.40 at 21–22).

that he lost the ability to understand what was going on."[13] It therefore determined that Mr. Outland's *Miranda* waiver was knowing and intelligent.

## II

We review the district court's order "under a dual standard, assessing conclusions of law *de novo* and evaluating factual findings for clear error with special deference granted to the court's credibility determinations" and its assessment of historical facts. *Outland I*, 993 F.3d at 1021; *see also United States v. Brooks*, 125 F.3d 484, 490–91 (7th Cir. 1997). We review *de novo* a district court's ultimate determination of whether a *Miranda* waiver was knowing and intelligent. *See United States v. Schwensow*, 151 F.3d 650, 659 (7th Cir. 1998).

A defendant may waive his *Miranda* rights so long as the waiver is voluntary, knowing, and intelligent. *Outland I*, 993 F.3d at 1021. A knowing and intelligent waiver is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Thus, for a waiver to be valid, the "totality of the circumstances surrounding the interrogation" must reveal "the requisite level of comprehension" by the defendant. *Id.* (internal quotation marks omitted). Relevant factors in this assessment include "the defendant's background and conduct, the duration and conditions of the interview and detention, the physical and mental condition of the defendant, the attitude of the law enforcement officials, and whether law enforcement officers used coercive techniques, either psychological or physical." *United States v.*

---

[13] *Id.* at 15–16.

*Shabaz*, 579 F.3d 815, 820 (7th Cir. 2009). It is the Government's burden to prove by a preponderance of the evidence the validity of a *Miranda* waiver. *Id.* at 817, 820.

Mr. Outland contends that, as a matter of law, the evidence before the district court cannot support a finding that he was aware of the nature of the rights he waived and of the consequences of doing so. His principal argument is that the district court relied on untrustworthy hearsay evidence that he had asked to speak with Weiss in the hospital. As Mr. Outland points out, at the evidentiary hearing, Weiss testified to an unsworn, out-of-court statement of another police officer who told him that Mr. Outland had asked for him. There are two problems with this argument. First, as Mr. Outland himself recognizes, during the suppression hearing, the district court was entitled to rely upon hearsay and other evidence that would not have been admissible at trial. *See United States v. Raddatz*, 447 U.S. 667, 679 (1980). More fundamentally, though, the district court did not give much weight to this evidence, likely because it was of little, if any, probative value in determining whether Mr. Outland's waiver was knowing and intelligent. Regardless of whether Mr. Outland did, in fact, request to speak with Weiss, the only relevant issue is whether—*after* Weiss arrived and administered the *Miranda* warning—Mr. Outland "underst[ood] the basic privilege" against self-incrimination and "the consequences of speaking freely" to Weiss. *Colorado v. Spring*, 479 U.S. 564, 575 (1987). In other words, even if Mr. Outland did not request to speak with Weiss, he could have knowingly and intelligently waived his *Miranda* rights just as well. Mr. Outland is mistaken in his suggestion that evidence of his request to speak with Weiss was central to the district court's findings: Weiss's hearsay testimony was only tangentially relevant to the basic

inquiry. The district court discussed it only briefly, reiterating its finding on *voluntariness*, and did not give it undue weight.

More broadly, Mr. Outland also contends that the district court did not appreciate the effects of his overdose and subsequent medication. This argument, too, fails. Although Mr. Outland plausibly maintains that his heroin overdose approximately two and a half hours before the Weiss interview affected his mental state, neither intoxication nor an impaired mental state necessarily renders a *Miranda* waiver invalid. *E.g., United States v. Huerta*, 239 F.3d 865, 873 (7th Cir. 2001); *Schwensow*, 151 F.3d at 660; *United States v. Turner*, 157 F.3d 552, 555–56 (8th Cir. 1998). Rather, the degree of intoxication and its effect, if any, on a defendant's ability to make a knowing and intelligent waiver are questions of fact. *Brooks*, 125 F.3d at 491. In *Brooks*, for instance, the defendant asserted that, at the time of waiver, he was "too sleepy, too high on crack cocaine, and in too much pain [from a hand injury] to be mentally capable of executing a knowing and intelligent waiver of his *Miranda* rights." *Id.* We deferred to the district court's finding that the defendant did have the capacity to waive his rights. Crediting law enforcement officers' impressions of the defendant as alert, coherent, and articulate, as well as their doubts that he was actually high from cocaine, the district court found the defendant's assertions not credible and determined that he possessed the requisite mental capacity to understand and waive his rights. *Id.* at 490–91; *see also United States v. George*, 987 F.2d 1428, 1430–31 (9th Cir. 1993) (valid *Miranda* waiver by defendant in the emergency room about three hours after a heroin overdose); *Turner*, 157 F.3d at 555–56 (valid waiver despite PCP intoxication).

Here, the district court took into account Mr. Outland's recent overdose but also considered evidence that, by the time of the interview and after several hours of medical supervision, his mental capacity was sufficient to understand his rights. First, the district court credited Weiss's testimony concerning his impressions of Mr. Outland during the hospital interview, including his observations that Mr. Outland was "very coherent," gave "very, very specific details," and appropriately modulated his voice.[14] Assessments of a defendant's coherence are regularly weighed in inquiries into the validity of *Miranda* waivers. *E.g., Brooks*, 125 F.3d at 490–91; *Schwensow*, 151 F.3d at 653–54, 660; *Henderson v. DeTella*, 97 F.3d 942, 948–49 (7th Cir. 1996); *George*, 987 F.2d at 1431. The court also reviewed the audio recording of the interview and the medical records and found these consistent with Weiss's testimony. Describing the audio recording, the court observed that Mr. Outland sounded awake and alert despite occasional slowness of speech and mumbling, and it noted that he "demonstrate[d] a range of emotions" and "easily recount[ed]" details of complex drug transactions.[15] Moreover, the court found it significant that, forty minutes into the hospital interview, Mr. Outland referred back to the *Miranda* warning, "demonstrat[ing] that [he] not only listened to Weiss's *Miranda* rights explanation but also understood the explanation."[16] Finally, the court explained that, during the evidentiary hearing, Mr. Outland was comparably aware,

---

[14] R.80 at 12 (quoting R.66 at 30).

[15] R.80 at 14.

[16] *Id.* at 15.

sharp, and clear-headed as he seemed in the audio recording. *See Brooks*, 125 F.3d at 491 (deferring to the district court's findings of fact, "which were based to a great extent on the judge's observation of the witnesses' demeanor").

Mr. Outland faults the district court for focusing on the absence of physical coercion in the interview and on its impression that Weiss was the more credible witness. But the district court's evaluation of the evidence was aimed precisely at understanding the exact degree of Mr. Outland's intoxication; this task required weighing the demeanor and credibility of the witnesses in light of the audio recording and the medical records. Mr. Outland also makes much of the fact that he was under the influence of various medications that the hospital had administered to him, but these medications were administered to *counter* the effects of his heroin overdose. And, as the district court noted, there was no evidence in the medical records that he experienced any adverse cognitive side effects from these medications. Rather, the hospital staff's notes reflect a stable and improved cognitive state beginning around 11:30 a.m., approximately an hour and a half before the interview began.

The district court's assessment was squarely within the realm of its competence in determining "the historical facts" of this case. *Brooks*, 125 F.3d at 491; *see also Schwensow*, 151 F.3d at 659–60. We owe the court deference in these factual findings. Having reviewed the evidence ourselves, we see no clear error in the district court's factual determination that Mr. Outland had the requisite mental capacity to make a knowing and intelligent waiver of his *Miranda* rights. The district court's legal conclusion as to the validity of the waiver

was not erroneous, and we therefore affirm the judgment of the district court.

AFFIRMED