In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-1751

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

CASEY DARREL HUNTER,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 4:11-cr-40055—**Michael M. Mihm**, *Judge.*

ARGUED NOVEMBER 27, 2012—DECIDED FEBRUARY 28, 2013

Before FLAUM and TINDER, *Circuit Judges*, and THARP, *District Judge.*[*]

TINDER, *Circuit Judge.* The United States brings this interlocutory appeal from a district court order suppressing statements made by the defendant, Casey Darrel Hunter, to two law enforcement officers who

---

[*] The Honorable John J. Tharp, Jr. United States District Judge for the Northern District of Illinois, sitting by designation.

were interrogating him. The district court granted Hunter's motion to suppress because it found that Hunter had unambiguously invoked his right to counsel before the interrogation with these officers had begun. We agree with the district court that Hunter had unambiguously and unequivocally invoked his right to counsel, and therefore, all questioning by law enforcement officers should have ceased under *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Because the two officers here interrogated Hunter after he had unambiguously invoked his right to counsel, Hunter's statements during the interrogation are not admissible.

## I

On the afternoon of May 3, 2010, Rock Island Police Officers Timothy Muehler and Jeff Key stopped a pickup truck after they witnessed the two occupants apparently engaging in a drug deal. Shortly after the truck stopped, the defendant, Hunter, fled from the passenger seat of the truck with something resembling a gun in his hand. Officer Muehler ordered Hunter to stop running, but Hunter continued to run. The officers then heard a gunshot. Officer Muehler immediately fired three shots at Hunter, striking him once in the left buttock and once in the foot. Hunter fell to the ground and was handcuffed. Police recovered a six-shot .38 revolver from the ground close to Hunter. The revolver had one spent shell casing in the cylinder.

Police arranged to have Hunter transported to Trinity Medical Center via ambulance so that he could receive

treatment for his gunshot wounds. Rock Island Police Detective Gene Karzin, who had arrived at the scene shortly after the shooting, agreed to accompany Hunter in the ambulance and to "babysit" Hunter in the emergency room until the investigating officers arrived. Hunter was handcuffed to the hospital gurney at all times while receiving medical treatment. Although Hunter's injuries were not life-threatening, Hunter told the emergency room staff that his pain registered at a "ten out of ten," and as a result, doctors administered morphine, fentanyl, and other narcotics to Hunter in the emergency room. Still, the nurse who had treated Hunter testified that he had remained "alert and oriented" throughout his time in the emergency room. (The district judge found that Hunter's alertness and capability of making a knowing and voluntary waiver of his rights were not affected by either his injuries or his treatment. That finding is not implicated in this appeal.) While Hunter was receiving treatment, Detective Karzin sat silently in the room until Hunter initiated the following interaction (as recounted by Detective Karzin's testimony):

> Q. Mr. Hunter asked if there were officers in the room, and you identified yourself?
>
> A. Correct.
>
> Q. Okay. At that point is when you advised him of his *Miranda* rights?
>
> A. Correct.
>
> Q. And after you advised Mr. Hunter of his *Miranda* rights, what did he say?

A. . . . one of the questions he asked me is what he was charged with. . . . He told me that he understood his rights. Then I asked him what occurred today. He said he didn't know. I asked him if he was willing to speak with me about the incident. He stated that he was willing to talk to me, but he just wanted a minute to think. At that point then he asked me what his charges were. . . . I walked out of the room because I didn't know at this point, and I talked to Sergeant Chadwick who, I believe, was waiting in the hallway out there. The only thing Sergeant Chadwick indicated to me was that they had found a gun at the scene. . . . So, I walked back in, told Mr. Hunter, I said, Well, they found a gun at the scene. Mr. Hunter then responded to me, So, you have me for being a felon in possession of a firearm? I indicated to Mr. Hunter that I believed that that was the case, as at that point I didn't know of any additional charges. . . . After that, at that point he asked to make some—several phone calls for him.

Q. And what specifically did the defendant say?

A. Best I can recollect, he said, Hey, can you call my mother and my father? I said, Okay. Do you have numbers for them—names and numbers? And he provided me the names and numbers. And then he says, Can you call my attorney? Told me Mr. Schultz was his attorney. Hospital personnel were still working on him. They were doing

their thing. I asked him—after that, I asked him, What do you want me to tell these people? He stated, Tell them that I've been shot.

Detective Karzin never made any "attempt to contact Attorney Herbert Schultz," even though Schultz was a well-known criminal defense attorney with whom Karzin had worked on several previous cases. Instead, he waited for Illinois State Police Investigator Dyan Morrisey and Milan Police Detective Chris George, who were assigned to investigate the case, to arrive at the emergency room. At that time, Karzin "indicated to Investigator Morrisey and George the information that [Hunter] provided and that he requested, that we contact three individuals and inform them that he had been shot." Morrisey and George did not remember Karzin telling them to call Schultz, so without any further action, they entered Hunter's hospital room and began interrogating him less than two hours after he had been shot.

Investigator Morrisey and Detective George began the interrogation by reading Hunter his full *Miranda* rights from a pre-printed card. Hunter did not ask Morrisey and George to call his attorney, nor did Hunter mention his earlier request that Karzin call his attorney. However, Hunter did ask Morrisey and George, "Do you know my attorney, Herb Schultz?" Morrisey and George did not view Hunter's question as an invocation of the right to counsel, and proceeded with their questioning. During the interrogation that followed, Hunter made incriminating statements, including an admission

that he was in the pickup truck because "he was actually making a gun transaction with [the driver,] Buddy."

Hunter's incriminating statements to Morrisey and George combined with the evidence found at the scene of the shooting led to Hunter's indictment on June 22, 2011 for being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g), 924(a)(2). Soon after his indictment, Hunter filed a motion to suppress his statements to Morrisey and George, claiming that he had "clearly and unequivocally invoked his right to counsel under *Miranda* by telling Detective Karzin, immediately upon receiving the *Miranda* admonishments, 'to call my mother, my father, and my lawyer, Herb Schultz.'" Hunter argued that because he had made a clear and unequivocal request for counsel to Detective Karzin, he should have never been subject to Morrisey and George's subsequent interrogation.

The district court agreed with Hunter, finding "no reasonable dispute" that Hunter's question, "Can you call my attorney?" was an unambiguous invocation of his right to counsel. The district court further rejected the government's argument that Hunter's request should be interpreted in light of his subsequent behavior:

> The government argues that, in telling his attorney that he has been shot, he is not invoking his *Miranda* rights. This argument fails, because once he stated that he wanted them to call his attorney, he had invoked his *Miranda* rights, and once done, the police could not go on to question

> him without a clear indication from him that
> he did not wish to have an attorney present.

As a result, the district court granted Hunter's motion to suppress his statements to Investigator Morrisey and Detective George on January 27, 2012.

A month later, the government filed a motion asking the district court to reconsider its January 27, 2012 order suppressing Hunter's statements. The government emphasized that *Edwards* did "not require police officers to cease all conversation or communication with a defendant once a defendant requests counsel; rather, it requires that *interrogation* cease." Detective Karzin's question, "What do you want me to tell these people?" did not amount to interrogation, the government argued, because it "was not reasonably likely to elicit an incriminating response." Consequently, the government asserted that consideration of Hunter's response, "Tell them that I've been shot," was appropriate when determining whether Hunter unambiguously invoked his right to counsel.

Once again, the district court rejected the government's argument. On February 28, 2012, the district court denied the government's motion to reconsider, finding that "What do you want me to tell these people?" amounted to interrogation. The court reasoned, "[W]hat answer could [Hunter] give that—other than perhaps the one he did—that would not be incriminatory? Or . . . what would this detective . . . have expected that this guy was going to say to that question?" After the district court held for a second time that it would suppress

Hunter's statements to Investigator Morrisey and Detective George, the government filed this timely interlocutory appeal. On appeal, we review the district court's decision on Hunter's motion to suppress "de novo . . . , but we review all findings of historical fact and credibility determination deferentially, under the clear error standard." *United States v. Johnson*, 170 F.3d 708, 712-13 (7th Cir. 1999).

## II

Whether the district court correctly granted Hunter's motion to suppress hinges on whether Hunter's request, "Can you call my attorney?" was an unambiguous invocation of his right to counsel. If Hunter's request was unambiguous, then the U.S. Supreme Court's holding in *Edwards*, 451 U.S. at 484-85, controls: an "accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." In contrast, if Hunter's request was ambiguous, then the Court's holding in *Davis v. United States*, 512 U.S. 452, 452 (1994) controls: "if a reference is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, *Edwards* does not require that officers stop questioning the suspect."

Once a court decides whether a defendant's request for counsel is ambiguous, the analysis is simple. Unfortu-

nately, in most cases—as in the case presently on appeal—the difficult decision is whether the defendant's request for counsel was ambiguous. *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987) offers some guidance, requiring courts to evaluate a defendant's request "as ordinary people would understand" it, and "to give a broad, rather than a narrow, interpretation to a defendant's request for counsel." Even more helpful is the guidance provided by reviewing the facts of previous cases that have come before both the Supreme Court and our court. We turn to a review of those cases now.

## III

Both the Supreme Court and our court have found statements indicating a certain and present desire to consult with counsel enough to invoke a defendant's right to counsel under *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). For example, in *Edwards*, 451 U.S. at 479, the defendant, Robert Edwards, was in the middle of a police interrogation when he stated, "I want an attorney before making a deal." The Supreme Court held that Edwards's statement unambiguously "expressed his desire to deal with the police only through counsel," and as a result, Edwards's subsequent confession was inadmissible (since the confession was the result of continued police questioning without an attorney). *Id*. at 484-85. Similarly, in *Smith v. Illinois*, 469 U.S. 91, 97 (1984), police asked the defendant, Steven Smith, if he would like to have an attorney present during questioning, and he replied, "Uh, yeah, I'd like to do that." Instead of

ceasing their interrogation after Smith requested an attorney, however, the police continued questioning Smith, and Smith confessed to armed robbery. The Supreme Court held that Smith's confession was inadmissible because "with the possible exception of the word 'uh' the defendant's statement in this case was neither indecisive nor ambiguous." *Id*. (citations omitted).

Following the direction of *Edwards* and *Smith*, our court has found statements indicating a certain and present desire to consult with counsel sufficient to invoke a defendant's right to counsel. For instance, in *United States v. Lee*, 413 F.3d 622, 625 (7th Cir. 2005), the defendant, Kenneth Lee, appealed his conviction of drug possession with intent to distribute based on the district court's admission of his confession after he allegedly invoked his right to counsel. The police had obtained a search warrant for Lee's apartment, and during the search, two police officers took Lee to a bathroom to explain the warrant to him. The officers then read Lee his *Miranda* rights and asked if Lee was willing to talk to them. Lee responded, "Can I have a lawyer?" *Id*. at 624. Our court found that Lee's request constituted an unambiguous request for an attorney, comparing Lee's statement to similar statements found by other circuits to be unequivocal. *See, e.g., Cannady v. Dugger*, 931 F.2d 752, 755 (11th Cir. 1991) ("I think I should call my lawyer."); *Robinson v. Borg*, 918 F.2d 1387, 1391 (9th Cir. 1990) ("I have to get me a good lawyer, man. Can I make a phone call?"); *Smith v. Endell*, 860 F.2d 1528, 1529 (9th Cir. 1988) ("Can I talk to a lawyer? At this point, I think maybe you're looking at me as a suspect, and

I should talk to a lawyer. Are you looking at me as a suspect?").

Most recently, our court found an even less direct statement by a defendant enough to constitute an unambiguous invocation of the right to counsel. In *United States v. Wysinger*, 683 F.3d 784, 790-91 (7th Cir. 2012), the defendant, John Wysinger, appealed his conviction of conspiracy to distribute and possess cocaine, based on the district court's admission of his videotaped interrogation by Drug Enforcement Administration (DEA) agents into evidence, despite the fact that Wysinger allegedly invoked his right to counsel. During Wysinger's interrogation, he had the following exchange with DEA agents:

> Rehg: Well, tell us what has been going on. Maybe that's the best way to start.
>
> Wysinger: I mean, do you think I should have a lawyer? At this point?
>
> Rehg: That is up to you. . . . I read you your rights. If you want an attorney, by all means, get one. Ok?
>
> Wysinger: I mean, but can I call one now? That's what I'm saying.

*Id*. at 790. Our court found that Wysinger's statements were enough to constitute an unambiguous invocation of the right to counsel. We acknowledged that "'I mean, do you think I should have a lawyer?' . . . [did] not constitute an unequivocal request for counsel." *Id*. at 795. Nonetheless, we believed that "Wysinger's very next sentence clarified the request and removed all doubt as to his

meaning. . . . 'I mean, but can I call one now? That's what I'm saying,' . . . in context, was an unequivocal request for counsel that no reasonable officer could interpret otherwise." *Id*. at 795-96.

In light of *Lee* and *Wysinger*, the text of Hunter's request to Detective Karzin appears to be an unambiguous request for counsel. Hunter's request, "Can you call my attorney?" sounds remarkably similar to the defendant's request in *Lee*, "Can I have a lawyer?" which we found sufficient to invoke the right to counsel. 413 F.3d at 626. Furthermore, Hunter's request sounds more certain and more definitive than the statement that we found sufficient in *Wysinger*, "I mean, but can I call one now?" 683 F.3d at 795. Indeed, comparing the text of the three requests side-by-side reveals several similarities in Hunter's, Lee's, and Wysinger's requests. All three defendants asked questions of a police officer who had previously read the defendants their *Miranda* rights. Instead of using a word like "should" or "might," which would suggest that the defendants were still undecided about whether they wanted a lawyer, all three defendants used the word "can." The defendants' choice of the word "can," by definition, means that they were inquiring into their present ability to be "able to" obtain a lawyer or to "have the opportunity or possibility to" obtain a lawyer. *Can*, Oxford Dictionaries Pro Online, http://english.oxforddictionaries.com/definition/can?region=us&rskey=OBo6rG&result=1 (last visited Feb. 26, 2013). In sum, given the text of the previous statements that our circuit has found sufficient to invoke the right to counsel, the text of Hunter's request was

sufficient to have put a reasonable officer on notice that Hunter was invoking his right to counsel.

**IV**

Comparing the text of Hunter's request, "Can you call my attorney?" to the requests of defendants that the Supreme Court and our court have found insufficient to invoke the right counsel strengthens our conclusion that Hunter's request was sufficient. In *Davis*, 512 U.S. at 455, the defendant, Robert Davis, was being questioned by investigators when he remarked, "Maybe I should talk to a lawyer." Investigators followed up on Davis's remark by asking him if he wanted a lawyer. Davis replied, "No, I'm not asking for a lawyer." *Id*. The Supreme Court held that Davis had not invoked his right to counsel, and consequently, all subsequent statements to investigators were admissible. *Id.* at 462; *cf. United States v. Zamora*, 222 F.3d 756, 761 (10th Cir. 2000) ("[I]f that's the case, then—then I might want to talk to an attorney.").

Similarly, in *United States v. Shabaz*, 579 F.3d 815, 818 (7th Cir. 2009), the defendant, Samuel Shabaz, asked an FBI Agent, "[A]m I going to be able to get an attorney?" as they entered an interview room (before any interrogation had begun). The agent did not respond to the question and left Shabaz alone in the interview room for a few minutes. Upon re-entering the room, the agent read Shabaz his *Miranda* rights; Shabaz expressly waived these rights and proceeded to confess to bank robbery. Here, our court found that Shabaz's statement did "not

clearly imply 'a present desire to consult with counsel.' . . . The words . . . did not unambiguously indicate to Agent Watson that Shabaz was right then asking for an attorney." *Id*. at 819 (citation omitted). Thus, our court found that the district court had properly admitted Shabaz's confession. *Id*.

In the present case, the text of Hunter's statement is more definitive than the statements by the defendants in both *Davis* and *Shabaz*, and as a result, is readily distinguishable. As discussed in the previous section, Hunter used the decisive word "can" when he asked Detective Karzin to call his attorney. In contrast, the defendant in *Davis* used the indecisive words "maybe" and "should." "Maybe" means only "perhaps" or "possibly," while "should" is "used to . . . ask advice or suggestions." *Maybe*, OXFORD DICTIONARIES PRO ONLINE,http:// english.oxforddictionaries.com/definition/maybe?region= us (last visited Feb. 26, 2013); *Should*, OXFORD DICTIONARIES PRO ONLINE, http://english.oxforddictionaries.com/ definition/should?region=us (last visited Feb. 26, 2013). In other words, the text of Davis's statement indicates that he was undecided whether he wanted an attorney present.

Shabaz's statement was more decisive than Davis's, but it still lacked the "present desire to consult with counsel" seen in Hunter's statement. *Shabaz*, 579 F.3d at 819. Shabaz asked if he was "going to be able to get an attorney." *Id*. "Going to" is a form of the future tense; Shabaz's verb choice indicates a possible desire to obtain an attorney *in the future*, not presently. *Go*, OXFORD DICTIONARIES PRO ONLINE, http://english.oxforddictionaries.com/definition/

go?region=us&rskey=rZWvP5&result=1#m_en_us125125
2.023 (last visited Feb. 26, 2013). Another notable distinc-
tion is that Shabaz's statement came before his inter-
rogation had begun. Hunter's statement, in contrast,
came after Detective Karzin asked Hunter "if he was
willing to speak . . . about the incident." All in all, the
text of Davis's and Shabaz's statements lack the indicia
of a certain and present desire to consult with counsel
seen in the text of Hunter's request.

## V

In addition to the actual text of Hunter's statement,
"Can you call my attorney?" both sides urge our court
to consider the context of Hunter's statement in order to
determine whether it was ambiguous. Hunter asks us
to consider what happened *prior* to Hunter asking Detec-
tive Karzin to call his attorney. Hunter was handcuffed
to a hospital gurney. After he had been read his *Miranda*
rights by a police detective, he told the detective that
he wanted "a minute to think" before he talked about
the shooting. The detective then told Hunter that police
had found a gun at the scene, which Hunter interpreted
to mean that he was facing the serious charge of being a
felon in possession of a firearm. In the context of these
prior events, Hunter argues that his request, "Can you
call my attorney?" constituted an unambiguous invoca-
tion of his right to counsel. On the other hand, the gov-
ernment asks us to consider what happened *subsequent*
to Hunter asking Detective Karzin to call his attorney.
Hunter only requested that Karzin tell his attorney he

had been shot—and Hunter never repeated his request for an attorney during Morrisey and George's ensuing interrogation. In the context of these subsequent events, the government argues that Hunter's request was, at best, an ambiguous request of his right to counsel.

In order to determine whether it is appropriate to consider the context prior or subsequent to Hunter's request, we turn to *Smith*, 469 U.S. at 98, for guidance:

> Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease. In these circumstances, an accused's subsequent statements are relevant only to the question whether the accused waived the right he had invoked. Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together.

*Smith* confirms that courts should only consider prior context when determining whether a defendant unambiguously invoked his right to counsel. (The government does not contend that Hunter's comment, "Tell them that I've been shot," constitutes waiver of an invocation of the right to counsel, and rightly so.)

Following the Supreme Court's directive in *Smith*, we have often looked to prior context when determining whether a defendant unambiguously invoked his right to counsel. For example, in *Lord v. Duckworth*, 29 F.3d 1216, 1218 (7th Cir. 1994), we looked to the events prior to the defendant's statement in order to determine that the statement was ambiguous. The defendant in that

case, Charles Lord, sought *habeas corpus* review of his Indiana state murder conviction based on, among other things, the admission of evidence at trial that came from a police interrogation after Lord allegedly requested counsel. While still a suspect in the murder case, Lord had given an eighty-minute-long statement to police about the murder, "including incriminating admissions. When the statement was completed, Lord agreed to assist the police in finding the gun that was used in the crime." *Id*. Only then did Lord state to the police officer, "I can't afford a lawyer but is there anyway I can get one?" *Id*. Out of context, the text of Lord's statement might have been enough to invoke the right to counsel. But in context—particularly in light of Lord's complete cooperation with authorities before requesting an attorney—we concluded that "Lord's statement lacked the clear implication of a present desire to consult with counsel." *Id.* at 1221.

Prior context of the defendant's statement also formed the basis of our decision in *United States v. Hampton*, 675 F.3d 720, 727-28 (7th Cir. 2012). In that case, the defendant, Deandre Hampton, could not decide whether he wanted counsel. First, he signed a *Miranda* waver; almost immediately, he "changed his mind and invoked his right to counsel, which was honored[, and] questioning immediately ceased." *Id.* at 727. Soon after, Hampton told his cell guard that "he wanted to proceed without counsel." *Id*. The questioning police officers administered new *Miranda* warnings, and one officer asked Hampton specifically if he wanted a lawyer. Hampton responded, "Yeah, I do, but you . . . ." *Id*.

Hampton then fell silent and asked the police "how the presence of an attorney would affect his situation." *Id*. at 728. The police attempted to respond to this question, at which point Hampton began trying to "fish . . . for a deal" while making incriminating statements. *Id*. In this context, our court found that the statement, "Yeah, I do, but you . . . ." was ambiguous, and Hampton had not invoked his right to counsel. While the text, "Yeah, I do," on its own would suggest that Hampton was invoking his right to counsel, we found that Hampton's use of the "hedge word 'but'" in the same sentence indicated "only that Hampton *might* want an attorney present," and consequently, Hampton's request was ambiguous. *Id*. at 727. Moreover, we found that consideration of the prior context supported our close textual reading of "Yeah, I do, but you . . ." as an ambiguous statement. Throughout his previous dealings with police, Hampton had vacillated back and forth between wanting counsel and not wanting counsel; reading Hampton's statement in light of this prior context made "Yeah, I do, but you . . ." appear to be more of the same indecision.

Like *Hampton*, we find that considering the prior context of Hunter's statement in the present case supports our close textual reading of Hunter's statement in Sections III and IV. In those sections, we noted that Hunter used decisive language like the word "can"—as opposed to indecisive words like "should"—indicating that Hunter's request, "Can you call my attorney?" was inherently unambiguous. Hunter's request becomes particularly unambiguous when read in light of what

had occurred previously. Hunter asked Detective Karzin, "Can you call my attorney?" only after he had been arrested, handcuffed to a hospital gurney, read his *Miranda* rights, and asked if he wanted to speak to a police detective. Moreover, Hunter's request to Detective Karzin followed his statement that he wanted "a minute to think" before he talked about the shooting and came on the heels of his inquiry whether police had him for being a felon in possession of a firearm. With everything that happened prior to Hunter asking Detective Karzin to call his attorney, the context lends further support to our conclusion that Hunter's request for counsel was unambiguous.

## VI

At oral argument, the government suggested that a ruling adverse to its position might discourage police officers from asking suspects "open-ended, benign, legitimate, clarifying" questions in the future. The government contends that its law enforcement officers want to follow the advice of the Supreme Court in *Davis*, which encourages (but does not require) "officers to clarify whether a suspect making an ambiguous statement really wants an attorney." *Davis*, 512 U.S. at 453. The government believes that the only way that its law enforcement officers will heed the Supreme Court's advice in *Davis* is by allowing officers to ask any number of clarifying questions like the one Detective Karzin asked Hunter, as long as these questions do not attempt to "undercut" the suspect or "to get [the suspect] to change his mind."

Like the Supreme Court in *Davis*, we also want to encourage officers to clarify whether a suspect wants an attorney, *but only if the suspect makes an ambiguous statement*. If the suspect makes an unambiguous request for an attorney, then there should be no need for clarification. Indeed, allowing police officers to continue asking questions—no matter how "benign" or "open-ended"—after a suspect unambiguously requests an attorney could indirectly undercut the suspect and eventually cause the suspect to question his initial, unambiguous request for an attorney.

As the district court found, there is no evidence here that Detective Karzin acted in bad faith or had any intention of undercutting Hunter when he asked the followup question, "What do you want me to tell these people?" But no matter how benign his intentions, Detective Karzin's follow-up question was an invitation to disaster. Hunter could have easily responded to Detective Karzin's question with an incriminating statement such as, "Tell them I fired a gun at a police officer." (Fortunately for Hunter, his actual response, "Tell them I've been shot," was not incriminating.) It is for this reason that the district court asked the government, "[W]hat answer could [Hunter] give that—other than perhaps the one he did—that would not be incriminatory? . . . [W]hat would this detective . . . have expected that [Hunter] was going to say to that question?" Any question that is "reasonably likely to elicit an incriminating response" and asked by a police officer after a suspect has unambiguously invoked his right to

counsel constitutes prohibited interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).[1] The district court

---

[1] The dissent relies heavily on *Innis*, 446 U.S. at 298-304, finding it dispositive as to whether Detective Karzin's follow-up question to Hunter constituted prohibited police interrogation. The facts in *Innis* are so different from the case at hand that we do not find it particularly illuminating. *Innis* clarified that "not . . . all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation." *Id.* at 300. Instead, only the statements obtained by police "from a person in custody . . . subjected to either express questioning or its functional equivalent" are the product of interrogation. *Id.* at 300-01. According to the Court, the defendant in *Innis* was not subjected to express questioning or its functional equivalent when he made incriminating statements to the police. *Id.* at 301-04. But the defendant in *Innis* made his incriminating statements under completely different circumstances than the defendant in the instant case. In *Innis*, police never spoke directly to the defendant after he invoked his right to counsel. Instead, the defendant overheard the conversation between two police officers while riding in the back of a patrol car and interrupted their conversation with incriminating information. *Id.* at 294-96. Contrast Hunter's situation, in which Detective Karzin not only spoke directly to Hunter—but expressly questioned him—when he asked, "What do you want me to tell these people?"

Nor does the dissent gain any ground by relying on the "direct questioning" language of *United States v. Briggs*, 273 F.3d 737, 740 (7th Cir. 2001). Although *Briggs* held that not all direct questioning by police constitutes impermissible "interrogation," again, the facts of *Briggs* are so different from

(continued...)

concluded, as we conclude, that Detective Karzin's state-
ment was "reasonably likely to elicit an incriminating
response"—whether Detective Karzin intended it to
do so or not.

   Not only was Detective Karzin's follow-up question
reasonably likely to elicit an incriminating response, but
it was also wholly unnecessary. Hunter had just been
shot, arrested, handcuffed to a hospital gurney, and read
his *Miranda* rights by a police detective. Why else
would Hunter have wanted to call his well-known
criminal defense attorney other than to invoke his right
to counsel? Even assuming Detective Karzin did not
intend his question to undercut Hunter's request for
counsel, given the circumstances, Hunter could have
viewed Detective Karzin's follow-up question as an
indirect way of undercutting his request for counsel. It is
precisely for this reason that the Supreme Court held

---

[1] (...continued)

the case at hand that we do not find it helpful. In *Briggs*, the
defendant told police officers, "[I]t doesn't matter anyway. I'm
going to die," after invoking his right to counsel. *Id*. at 739.
Concerned for his mental state and physical well-being, the
police responded by asking the defendant what he meant by
that statement. *Id*. We held the police's question did not consti-
tute impermissible interrogation because it was not "rea-
sonably likely to elicit an incriminating response." *Id*. at 741
(quoting *Innis*, 446 U.S. at 301-02). Contrast Detective Karzin's
question, which could have invited any number of incrim-
inating responses by Hunter about his involvement in the
gun incident with Rock Island police.

in *Smith*, "Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, *all questioning* must cease." 469 U.S. at 98 (emphasis added).

## VII

Given the decisive language and the prior context of Hunter's request to Detective Karzin, we find that Hunter's request, "Can you call my attorney?" was an unambiguous and unequivocal request for counsel. Consequently, under *Smith*, 469 U.S. at 98, all questioning by Detective Karzin should have ceased as soon as Hunter made this request. Because questioning did not cease, however, it would be inappropriate under *Edwards*, 451 U.S. at 484-85, for the court to consider Hunter's subsequent statements to Detective Karzin, Investigator Morrisey, and Detective George for any purpose. As a result, we AFFIRM the decision of the district court to suppress Hunter's subsequent statements, including the incriminating statements that Hunter made to Investigator Morrisey and Detective George.

THARP, *District Judge*, dissenting.  This is a case in which the Court affirms the suppression of custodial statements made by a defendant who did not invoke his right to counsel and where the police conduct on which suppression was premised did not constitute interrogation but rather attempted to *facilitate* the suspect's desire to communicate with counsel. This result turns *Miranda*'s prophylactic rules inside out, and I therefore respectfully dissent.

## I.

The facts are generally not in dispute but bear further review. After being shot while fleeing from police, Hunter was taken to the hospital, accompanied by Detective Gene Karzin. At the hospital, while medical personnel attended to Hunter, Karzin sat quietly in the room. Only when Hunter asked if a police officer was present did Karzin speak to Hunter; at that point, he identified himself and advised Hunter of his rights.[1] Hunter indicated that he understood his rights and asked Karzin

---

[1] The district court found that Karzin neglected to advise Hunter that he had the right to have counsel appointed if he could not afford an attorney, but Hunter does not argue that the omission of that portion of the *Miranda* warning is relevant to the question of whether his statements should be suppressed. Indeed, it is Hunter's reference to an attorney who was already representing him (albeit in connection with other charges) that creates the issue at bar, not that Hunter wanted, but was not advised of his right to, appointed counsel.

what he was charged with. Karzin asked whether Hunter was willing to talk to him about what happened, and Hunter said that he was willing to talk to Karzin, but just wanted a minute to think.[2] Detective Karzin, who did not know the facts relating to Hunter's shooting and arrest, asked a police officer in the hallway about Hunter's situation and was advised only that police had found a gun at the scene. Karzin then relayed this information to Hunter, who responded not by invoking his right to remain silent, or requesting counsel, but by saying, "So you have me for being a felon in possession of a firearm?" Detective Karzin af-

---

[2] The district court's account of Detective Karzin's testimony on this point appears to be mistaken in one respect. The district court recalled Detective Karzin as testifying that, after indicating that he was willing to talk to Karzin, Hunter "almost immediately said, 'But I want to think about this.'" (Tr. 182). In fact, Karzin testified only that Hunter said "he just wanted a minute to think." (Tr. 19). Karzin's report similarly indicates that Hunter said only that he wanted a minute to think before talking to Karzin, not that he wanted to think about whether or not to speak to Karzin. The two statements are not the same; the statement Hunter actually made (suggesting only that Hunter wanted to collect his thoughts before talking to the officer) was not at all inconsistent with his statement that he was willing to speak to Karzin, while the version on which the district court premised its ruling suggests that Hunter had never affirmatively acknowledged his willingness to talk to Karzin. Thus, the district court's imprecise recollection of this testimony may well have influenced its assessment of Hunter's request as an invocation of his right to counsel.

firmed that appeared to be the case, and also testified that Hunter appeared to be relieved that was the charge he was facing. (Tr. at 25:7-11). Hunter next asked Karzin if he would call his mother, his father, and his attorney, and provided the numbers for his parents but not his attorney. Karzin posed a single follow-up question to this request, asking Hunter what he wanted Karzin to tell "these people." Hunter did not respond that he wanted Karzin to tell the lawyer that Hunter wanted to consult with him; he had the same message for the lawyer that he had for his parents: "Tell them that I've been shot."

After this exchange, Hunter was taken for a CAT scan, during which he asked a technician whether Detective Karzin was still in the room. Understanding Hunter to be asking to speak with Karzin, the technician advised Hunter that he would be able to talk to the police after the CAT scan had been completed. As Hunter was wheeled back on a gurney to the initial treatment room, he continued to ask if Karzin was present. At that point, other investigators (Dyan Morrisey and Chris George) assigned to the case had arrived at the hospital and took over for Detective Karzin. Before leaving the hospital, Karzin introduced them to Hunter. Karzin also told the new arrivals that Hunter had asked him to call his parents and Herbert Schultz, his attorney, and to tell them that he had been shot. Before they questioned Hunter, Morrisey and George subsequently advised Hunter of his *Miranda* rights (as had Karzin), and Hunter made the incriminating statements that he later sought to suppress. Hunter never asked Morrissey or George whether any-

one had contacted his parents or his attorney, nor did he indicate in any way that he wished to consult with an attorney, even though he asked the investigators whether they knew Schultz.

## II.

To invoke the *Miranda* right to counsel, "the suspect must unambiguously request counsel." *Davis v. United States,* 512 U.S. 452, 459 (1994). The majority views Hunter's request that Karzin call his attorney to be an unambiguous request for counsel, but in so concluding I believe that the majority gives insufficient weight to the factual context—both before and after this statement was made—necessary to evaluate the import of the suspect's reference to his attorney.

The majority bases its opinion almost entirely on Hunter's use of a single word: "can." By using the word "can," the majority concludes, Hunter was "inquiring into [his] present ability to be 'able to' obtain a lawyer or to 'have the opportunity or possibility to' obtain a lawyer." Slip Op. at 12. I do not dispute the majority's definition, but as an initial matter it is far from clear that an inquiry into one's present ability to obtain a lawyer constitutes an unambiguous statement of one's desire to consult with an attorney. Ability is not a synonym of desire; viewed in isolation, "can I have a lawyer" does not *necessarily* mean the same thing as "I want a lawyer." It might, but that question cannot be answered simply by consulting a dictionary. The majority cites several cases in which this Circuit has treated references

to counsel using the word "can" as an invocation of the right to counsel, and I agree, based on the facts of those cases, that the defendant was invoking the right to counsel. Other cases, however, demonstrate that a suspect's use of "can" does not always constitute an unequivocal invocation of the right to counsel. *Lord v. Duckworth,* 29 F.3d 1216 (7th Cir. 1994), illustrates the point perfectly. In *Lord,* this Court held that a suspect's statement to police that "I can't afford a lawyer, but is there any way I can get one?" was *not* sufficiently clear to constitute an invocation of the right to counsel, holding that the statement "lacked the clear implication *of a present desire to consult with counsel*." *Id.* at 1221 (emphasis added). *See also, e.g., Dormire v. Wilkinson,* 249 F.3d 801, 805 (8th Cir. 2001) ("'Could I call my lawyer' was not an unambiguous request for counsel."); *United States v. Dixon,* No. 8:10-cr-135-T-30MAP, 2010 WL 5209359, *4 (M.D. Fla. Nov. 18, 2010) ("Can I have my lawyer here while we talk" ambiguous as to ability or desire); *United States v. Cook,* No. 07-CR-6195 CJS, 2008 WL 728883, *14 (W.D.N.Y. Mar. 17, 2008) (suspect's question if he would be able to call attorney not an unambiguous invocation of right to counsel); *United States v. Eastman,* 256 F. Supp. 2d 1012, 1019 n.6 (D.S.D. 2003) ("Can I have a lawyer" held not to be an unambiguous invocation of right to counsel). If, as the majority maintains, "*can* I have a lawyer" is an unambiguous invocation of the right to counsel, how can so many courts—including this one—have found equivalent statements to be ambiguous?

The answer is context. As this Court has repeatedly emphasized, we do not give talismanic import to the words used by a suspect; the analysis of whether a suspect has unambiguously invoked the right to counsel "does not end with words alone; . . . we also consider the circumstances in which the statement was made." *United States v. Hampton*, 675 F.3d 720, 727 (7th Cir. 2012) (quoting *United States v. Shabaz*, 579 F.3d 815, 819 (7th Cir. 2009)). The majority opinion, however, devotes just two sentences to the assessment of the context in which Hunter's request was made. Slip Op. at 19. The first notes that Hunter asked Karzin to call his attorney "only after he had been arrested, handcuffed to a hospital gurney, read his *Miranda* rights, and asked if he wanted to speak to a police detective." That a suspect was questioned in custody, however, says only that *Miranda* applies (absent custodial interrogation, it does not); the facts that establish that precondition shine no light on whether the suspect unambiguously invoked his right to counsel. The second appears to characterize Hunter's statement that he wanted "a minute to think" before talking about the incident as uncertainty about whether to talk to Karzin. *See* Slip Op. at 19 and *supra* note 2. The uncontroverted evidence, however, is that Hunter told Karzin that he was willing to talk to him. Hunter did *not* say that he wanted a minute to think *before deciding whether to talk to Karzin*—rather, he initiated the dialog with Karzin in the first place. The record before us provides no basis to infer that Hunter's statement that he wanted to think a minute must, or should, be interpreted as a qualifica-

tion on his willingness to talk to Karzin—particularly when he proceeded to do so.

Even if one accepts that "can you call my lawyer," standing alone, constitutes an unambiguous invocation of the right to counsel, when, as here, that statement is made after a suspect has sought out a police officer, agreed to talk to him, and after he has made incriminating statements to the police officer, there is at the very least a tension between these actions and the reference to counsel that reflects ambiguity in the suspect's intentions and warrants clarification. For that reason, this Court has confirmed more than once that a suspect's equivocation about whether or not to speak to police following *Miranda* warnings introduces an element of ambiguity into the analysis of what might otherwise be deemed an adequate invocation of counsel. *See, e.g., Hampton*, 675 F.3d at 727 (suspect's prior agreement to talk to police a factor bearing on meaning of his purported invocations of counsel); *Lord,* 29 F.3d at 1221 ("is there any way I can get [a lawyer]" held ambiguous in light of prior incriminating statements made by suspect).

The ambiguity arising from Hunter's mixed signals (accepting, *arguendo*, that Hunter intended to invoke his right to counsel when he asked Karzin to call Schultz) is compounded by the fact—which the majority opinion does not discuss—that Hunter did not ask Karzin to call just his lawyer; his request came on the heels of his request that Karzin call both of his parents as well. Stand in Detective Karzin's shoes at that point: Hunter had

sought Karzin out, agreed to talk, made incriminating statements, and then asked the detective to call his mother, father, and attorney. In that context, is it perfectly clear that Hunter wanted Karzin to call Schultz because he did not want to talk any further with Karzin? Other courts have found ambiguity in requests to call both parent and attorney—*see, e.g., Jones v. McNeil,* No. 3:07-cv-146-J-32, 2010 WL 893816, *9 (M.D. Fla. Mar. 9, 2010) (suspect's statement that he wanted to speak "to his mother, his attorney, and [a detective]" did not unambiguously invoke right to counsel); *Glover v. Portuondo,* No. 96 Civ. 7616(JGK), 1999 WL 349936, *3, *5 (S.D.N.Y. May 28, 1999) (suspect stopped interrogation to request lawyer via a friend, and then through mother; statements made after detective asked for phone numbers and while dialing not suppressed). What makes Hunter's multifaceted request any clearer?

The majority asks, "Why else would Hunter have wanted to call his well-known criminal defense attorney other than to invoke his right to counsel?" Slip Op. at 22. That is a curious rhetorical question, since there was another reason (to "tell them I've been shot"), but Hunter could have intended any number of other messages as well. Perhaps he was going to miss an appointment with Schultz; or wanted Schultz to talk with his parents about a retainer (*see, e.g., Flamer v. Delaware,* 68 F.3d 710, 716, 725 (3d Cir. 1995) (suspect's request to call mother in order to retain family's counsel "failed to meet the requisite level of clarity" to constitute an unambiguous invocation of counsel), *cert. denied,* 516

U.S. 1088 (1996)); or to let Schultz know that he should start negotiating a plea bargain (*see, e.g., United States v. Jardina,* 747 F.2d 945, 949 (5th Cir. 1984)). Who knows? We don't, and Karzin didn't either. The point is that there are reasonable explanations for the request other than a desire to obtain legal advice before speaking further with the police—indeed, the possibilities just set forth seem more likely than the reason that Hunter actually gave. The fact that we could not have predicted Hunter's actual response to Karzin's question only confirms that there are also many possibilities that would not even occur to us. That is precisely why the Supreme Court held in *Davis* that it is the suspect's burden to make an unambiguous assertion of the right to counsel: to avoid forcing police officers "to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong." 512 U.S. at 461. In the context of this case, Detective Karzin couldn't know why Hunter wanted to talk to Schultz until he asked a simple question to clarify Hunter's ambiguous and open-ended request.

That is exactly what both the Supreme Court and this Court have repeatedly told police to do. In *Davis,* the Supreme Court advised police to seek clarification of a suspect's intentions at the time of the request in order to avoid "judicial second-guessing" about whether the suspect intended to invoke his right to counsel or not. *Davis*, 512 U.S. at 461 (police have no obligation to clarify an equivocal or ambiguous reference to counsel,

but "it will often be good police practice . . . to clarify whether or not [the suspect] actually wants an attorney"). This Circuit has time and again reinforced that message. *See, e.g., United States v. Wysinger,* 683 F.3d 784, 795 (7th Cir. 2012) ("we encourage law enforcement officers to heed the Supreme Court's suggestion in *Davis*"); *United States v. Lee*, 413 F.3d 622, 626-27 (7th Cir. 2005) ("We highly encourage police to follow the advice offered by the Supreme Court and take the time to clarify such issues at the time of interrogation rather than in after-the-fact arguments before the courts."). Detective Karzin followed this advice—but still cannot escape "judicial second guessing."

Because Detective Karzin asked an utterly benign question in response to Hunter's request, it is clear that Hunter did not intend to invoke his right to counsel. Hunter responded not by saying, "Tell my lawyer I'd like him to come to the hospital to consult before I talk to you any further," but by asking the detective to tell both his parents and the attorney the very same thing: "Tell them I've been shot."[3] As the government made the

---

[3] Hunter's subsequent conduct reinforces the point. While a CAT scan was being taken, Hunter affirmatively asked again if Karzin was present, only to be told by medical staff (who clearly understood his question to indicate that he wanted to talk to Karzin) that he would be able to talk to the police after the CAT scan procedure had been completed. And, of course, we know that Hunter, before talking to other detectives, did not (as one would expect had he intended to invoke his right to counsel) inquire about the status of his request

(continued...)

point at oral argument, if Hunter had asked Karzin, "Can you call my parents and lawyer and tell them I've been shot," it is difficult to imagine that anyone would have construed Hunter's question as an invocation of the right to counsel. Certainly it would not have been an *unambiguous* invocation of that right.[4]

Citing *Smith v. Illinois,* 469 U.S. 91 (1984), the majority maintains that Hunter's response cannot be considered

---

(...continued)

that Karzin call Schultz and did not invoke his right to counsel when other detectives again provided *Miranda* warnings before they attempted to interview Hunter. Instead, consistent with his earlier statement to Karzin that he was willing to talk to the police, he voluntarily answered their questions. This Court has repeatedly held that the fact that a suspect "did not pursue the matter any further" after an initial inquiry about counsel is an important factor in assessing whether that inquiry constituted an invocation of counsel. *Shabaz,* 579 F.3d at 819 (quoting *Lord,* 29 F.3d at 1221). *See also, e.g., United States v. Walker,* 272 F.3d 407, 413-14 (7th Cir. 2001) (suspect's ambiguous statement interpreted in light of his later agreement that police could "go ahead" with their questioning).

[4] The district court agreed that Hunter's reference to counsel was ambiguous when viewed in the context of his statement, "Tell them I've been shot." Tr. 184. Indeed, the district court criticized Karzin for not asking *additional* follow-up questions. *See* Tr. 184-85 ("Now, if the officer had said at that time, Well now wait a minute. You said you wanted to talk—you wanted me to call Herb Schultz. What does that mean? Do you want to talk to us without talking to him? . . . In other words, some clarification of that ambiguity that was created by the officer's question, not by the defendant's original statement.").

because it came *after* he had unambiguously invoked his right to counsel. Slip Op. at 16 ("courts should only consider *prior* context when determining whether a defendant unambiguously invoked his right to counsel") (emphasis added). As discussed above, viewed in context Hunter's reference to counsel was *not* unambiguous, but even putting that disagreement aside, the majority's reliance on *Smith* as justification for ignoring Hunter's response to Karzin's statement remains misplaced. Neither *Smith* nor any other opinion of the Supreme Court or this Court holds that police may say nothing more to a suspect once he has invoked his right to counsel (even unambiguously). *Smith* (and *Edwards*, on which it builds) bars only further "interrogation" after the invocation of counsel. *See Smith*, 469 U.S. at 91 ("Under *Miranda* and *Edwards*, . . . an accused's postrequest responses *to further interrogation* may not be used to cast doubt on the clarity of his initial request for counsel."); *id.* at 100 ("We hold only that . . . an accused's *postrequest* responses *to further interrogation* may not be used to cast doubt on the clarity of the initial request itself.") (some emphasis added); *Edwards v. Arizona*, 451 U.S. 477, 484 (1981) (when an accused has "expressed his desire to deal with the police only through counsel, [he is] not subject *to further interrogation* until counsel has been made available") (emphasis added). Neither case bars consideration of post-request statements that are *not* the product of interrogation, and for good reason: the Supreme Court held in *Rhode Island v. Innis*, 446 U.S. 291 (1980), that absent "interrogation," *Miranda* imposes no impediment to the use of a suspect's state-

ments. *Id.* at 299-300 ("not . . . all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation"). *See also Edwards,* 451 U.S. at 485 (*Innis* established that "[a]bsent [custodial] interrogation, there would have been no infringement of the right [to counsel] that Edwards invoked").

In holding that *Smith* precludes consideration of Hunter's response to Karzin's question in assessing whether Hunter was invoking his right to counsel, then, the majority reads *Smith* too broadly. *Innis* teaches that the timing of a suspect's statement is not the focus of the prophylactic rules of *Miranda* and *Edwards*, but the nature of the conduct that elicited it: "the issue . . . is whether the respondent was 'interrogated' by the police officers in violation of the respondent's . . . right to remain silent until he had consulted with a lawyer." *Innis,* 446 U.S. at 298. And "interrogation" encompasses only "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301.[5]

---

[5] *Smith*, which was animated by the need to prevent "the authorities through badgering or overreaching—explicit or subtle, deliberate or unintentional [from wearing] down the accused and persuad[ing] him to incriminate himself not withstanding his earlier request for counsel's assistance," 469 U.S. at 95 (internal citations omitted), is not inconsistent. There, the Supreme Court concluded that there was "subse-

(continued...)

The district court recognized that its inquiry should turn on whether Karzin's question "would reasonably be intended or anticipated to lead to some incriminating response." Reh'g Tr. at 18. That is the right question, but I respectfully submit that the district court reached the wrong answer. Detective Karzin did not "interrogate" Hunter by responding to a question that Hunter posed. Relying on *Innis,* this Court has previously observed that a "police officer's response to a direct inquiry by the defendant does not constitute 'interrogation.'" *United States v. Briggs,* 273 F.3d 737, 740 (7th Cir. 2001). *See also United States v. Hendrix,* 509 F.3d 362, 374 (7th Cir. 2007) (same, citing *Briggs,* 273 F.3d at 740). And in holding that a police officer's direct question to a suspect about what he meant when he said he was "going to die," we acknowledged in *Briggs* what *Innis* made clear: "not all direct questions [posed by police to a suspect] constitute 'interrogation.' Only questions that are 'reasonably likely to elicit an incriminating response from the suspect' are improper." 273 F.3d at 741 (quoting *Innis,*

---

(...continued)

quent interrogation" by the police following an unequivocal invocation of the right to counsel that included, among other things, misstatements that suggested to the suspect that he "had to" talk to police. *Id.* at 99 & n.8. The concerns that animated the Supreme Court's opinion in *Smith* do not exist where, as here, police do *not* interrogate—that is, where they do not engage in conduct that is reasonably likely to elicit incriminating statements.

446 U.S. at 301-02).[6]

Though it agrees that Hunter's response to Karzin's question was not incriminating, the majority maintains that the question was "an invitation to disaster," Slip Op. at 20, because Hunter "could have easily responded . . . with an incriminating statement." But the interrogation test is not whether it is *possible* that a suspect might incriminate himself, but whether it is reasonably *likely* that he would do so in response to the police conduct.

To take the view that Karzin's question was reasonably likely to elicit an incriminating response, one would have to believe it likely that Hunter would confess while simultaneously telling the police he would not talk without a lawyer. That counterintuitive premise is the sole justification the majority offers for its view that Karzin's single question constituted "interrogation." The majority does not tell us why it is likely that Hunter, in the course of invoking his right to counsel, would tell Karzin that he had shot a police officer, and

---

[6] The majority notes, Slip Op. at 21, n.1, that the facts of *Innis* itself are different than those in this case, but that says nothing about the relevance of the test that *Innis* established to assess whether police conduct constitutes interrogation. The majority does not question the relevance or continuing vitality of the *Innis* test. And in any event, the majority's view that Karzin's express question to Hunter distinguishes this case from *Innis* cannot be reconciled with this Court's holding in *Briggs*, where this Court expressly rejected the notion that where a police officer asks a suspect a direct question, there is necessarily interrogation.

I cannot fault Detective Karzin for the evident deficit in his imagination in failing to anticipate that remote possibility. The majority's scenario is implausible and indulging such fanciful scenarios, in my view, turns the *Innis* test into one that requires police to refrain from all conduct that does not *foreclose* the possibility of eliciting an incriminating response.

That approach is inconsistent not just with *Innis*, but with the myriad cases in which this Court has held that *Innis* permits conduct far more provocative than Detective Karzin's single question in response to Hunter's inquiry. Karzin's response to Hunter pales in significance to police dialog with custodial suspects that this Court has held not to rise to the level of interrogation. *See, e.g., United States v. Johnson*, 680 F.3d 966, 977 (7th Cir. 2012) (presenting or reciting the evidence against a suspect does not constitute interrogation, and citing cases from this and other circuits supporting that proposition); *United States v. Knope*, 655 F.3d 647, 652 (7th Cir. 2011) (administrative questions—*e.g.*, address of residence—do not constitute interrogation even where they lead to discovery of incriminating evidence); *Hendrix*, 509 F.3d at 374 (officer's dialog with suspect about what had been found during execution of search warrant "may have aroused [suspect's] curiosity", but did not constitute interrogation); *United States v. Shlater*, 85 F.3d 1251, 1256 (7th Cir. 1996) (requests for consent to search do not constitute interrogation under *Innis* standard). And if, as this Court held in *Briggs*, a police officer can directly question a suspect about what he meant when he said he was "going to die" did not consti-

tute interrogation under *Innis*, it is difficult to fathom how an officer's innocuous response to a question *posed by the suspect*, such as "what do you want me to tell these people?" could be deemed to undercut the right to counsel.

It cannot—and this Court's recent decision in *Hampton* proves the point. In *Hampton*—which also happened to involve a defendant who "was arrested for unlawfully possessing a firearm as a felon after he discarded a loaded handgun during a foot chase with police"—this Court held that officers "did not violate the *Miranda/Edwards* rule," 675 F.3d at 723, by asking questions to clarify the suspect's intent to invoke counsel, *even assuming that his request for counsel was unambiguous. Id.* at 728. The questions police posed there following the invocation of counsel, we held, did not undercut the prophylactic safeguards *Miranda* and *Edwards* imposed because they did not constitute "an interrogation at all." We found them instead to be "just what the Supreme Court recommends that officers do in this situation." *Id.* at 728. Because "no interrogation occurred" when the officers attempted to clarify the suspect's intent, the Court considered the suspect's further statements regarding his intention in assessing whether or not he had invoked his right to counsel—and concluded that he had not. *Id.* at 728-29.

The same rationale explains why this Court, in *Lee,* admonished police to ask clarifying questions in the context of a case in which the suspect's reference to an attorney came in the form of a question ("Can I have an

attorney?") that the majority now says is so unambiguous as to permit no follow up at all—even follow-up that would be necessary to *facilitate* the suspect's communication with counsel. *See* 413 F.3d at 626-27 (following that question, police should have either halted interrogation or obtained further clarification of the suspect's intent to invoke counsel).

In the absence of interrogation, there is no reason or basis to exclude Hunter's response to Karzin's question from the assessment of whether Hunter's request that Karzin call Schultz should be construed as an invocation of counsel.[7] Though the majority says that Karzin's question was "wholly unnecessary," even if that were the test (and, again, it is not), the question was anything but: to carry out Hunter's request, Karzin had to know what Hunter wanted him to say. That is true even if Hunter had been invoking counsel in asking Karzin to make the call; indeed, it is arguably even more important in that context that the law enforcement official relay the right message. Why should a police officer's attempt to accurately relay a message from a suspect to his lawyer be impermissible? Would we rather they guess?

These questions highlight what, in my view, is most problematic about suppressing Hunter's subsequent

---

[7] The majority notes (Slip Op. at 16) that the government does not contend that Hunter's response to Karzin's question constitutes a waiver of an invocation of the right to counsel. That is correct, but beside the point. Hunter didn't waive his right to counsel after invoking it; as his response confirms, he didn't invoke the right in the first place.

statements: Detective Karzin's question, by its express terms, was far more likely to facilitate Hunter's communication with counsel than to obstruct it. The Supreme Court instituted the requirement of providing prophylactic *Miranda* warnings to protect, among other things, a suspect's Fifth Amendment right to counsel. *See Berghuis v. Thompkins,* ___ U.S. ___, ___ , 130 S. Ct. 2250, 2261 (2010) ("The main purpose of *Miranda* is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel," citing *Davis*, 512 U.S. at 460). If, as the majority posits, Hunter's request must be regarded as an expression of his desire to consult with counsel, then delivering the substance of his message to counsel plainly promotes and enhances the suspect's exercise of that right. Karzin's inquiry explicitly sought to do just that. The troubling irony in the majority's opinion, then, is that it turns *Miranda* inside out, *penalizing* police for attempting to facilitate communication with counsel rather than encouraging them to do so. Surely we want police officers to relay messages to counsel when a suspect is unable to make the call themselves? But why, in light of this opinion, would they ever agree to do so?

## III.

At oral argument, the government's counsel asked: What is it about the facts of this case that offends our Constitutional sensibilities? When a defendant plainly has not invoked his right to counsel and the government did nothing that was intended, or likely, to under-

mine that right, I do not find anything that offends my Constitutional sensibilities. By contrast, a rule that suppresses evidence is "justified only by reference to its prophylactic purpose." *Connecticut v. Barrett,* 479 U.S. 523, 528 (1987). When application of a prophylactic rule would diminish, rather than enhance, the constitutional rights the rule is intended to protect, I cannot endorse that result. I therefore respectfully dissent.