In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-3751

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SAMUEL SHABAZ,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 CR 855—**Suzanne B. Conlon,** *Judge.*

ARGUED JUNE 4, 2009—DECIDED AUGUST 27, 2009

Before FLAUM, WOOD and TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.*   On December 21, 2007, Samuel
Shabaz was arrested at his home in Chicago, Illinois,
by agents of the Federal Bureau of Investigation. The
FBI agents were acting under the authority of an arrest
warrant that named Shabaz as a suspect in a robbery at
a TCF Bank, which is located in Oak Lawn, Illinois. Fol-
lowing the arrest, the FBI agents, along with officers
from the Oak Lawn Police Department, took Shabaz to

the Calumet City Police Department. (Oak Lawn and Calumet City are both south suburbs of Chicago.) Once there, Shabaz confessed to his role in two bank robberies. In due course, a federal grand jury indicted him on one count of attempted bank robbery and two counts of bank robbery, in violation of 18 U.S.C. § 2113(a). Shabaz moved to suppress his confession, asserting that it was taken in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). After the district court denied his motion, Shabaz entered a conditional plea of guilty, reserving the right to appeal the court's refusal to suppress the confession. We conclude that Shabaz cannot prevail unless we were to overturn key credibility rulings of the district court. Finding no reason to do so, we affirm.

**I**

Shabaz's appeal turns on what happened to him after he found himself at the Calumet City Police Department. The parties' accounts differ significantly. The Government presented evidence that once Shabaz arrived at the police station he asked to use, and was permitted to use, the bathroom. Agent Watson testified that before Shabaz was taken into the interview room, he heard Shabaz use the word "attorney" or "lawyer," although he did not remember the context in which the word was used. Agent Watson said that he was sure that Shabaz did not request an attorney. Once Shabaz was led into the interview room, Agent Watson made introductory remarks, identified who was there, explained to Shabaz why

he had been arrested, and outlined the topics that the FBI wanted to discuss with him. Agent Watson then read Shabaz his *Miranda* rights and asked him to sign an "advice of rights" waiver form. Shabaz stated that he understood his rights, but he refused to sign the form. Instead, he said that he would continue to speak to the FBI but would stop any time he felt he did not want to answer a question. The officers denied making any promises of lenience to him.

Shabaz told quite a different story. According to him, as soon as he had arrived at the police station and used the restroom, he asked Agent Watson, "[A]m I going to be able to get an attorney?" (In its brief, the Government appears to agree that Shabaz asked this question.) Agent Watson replied, "[L]et's just get you down here," pointing to an interview room. Shabaz testified that as he entered the interview room, Agent Watson said, "[W]e know what you've been doing," and asked him to "start at the beginning." Shabaz testified that he asked for a lawyer several times and was ignored. At some point, Shabaz asked to speak with two people: his girlfriend, Maritza Velazques, and his friend Kabir. The officers refused to let him do so until he agreed to cooperate. Shabaz asserted that they repeatedly told him that he would be treated with lenience if he cooperated. Shabaz stated that he stopped requesting an attorney because he believed that he would not be provided with one.

Both sides agree that the FBI agents presented Shabaz with a "consent to search" form, which he signed. The Government says that the form described Shabaz's

house, two Dodge vans, and his cellular telephone. Shabaz, however, testified that the consent to search form did not list the places to be searched at the time that he signed it. There is additional disagreement about when Shabaz was asked to sign the consent to search form and at what point the agents began seriously to question him. But once the questioning began, Shabaz confessed in detail to robbing the TCF Bank in Oak Lawn on two different occasions and once attempting to rob the Standard Bank and Trust, also in Oak Lawn. His confession included information about his planning and execution of the robberies, his motive, and his disposition of the money. He also identified himself in the bank surveillance photographs from each of the robberies, and he signed them to acknowledge that he was the man in them.

## II

In the district court, Shabaz moved to suppress all of the incriminating statements he made during the interview, arguing that his question in the hallway about an attorney was an unambiguous request for counsel. When the agents persisted in interrogating him, he reasons, they violated his *Miranda* rights, and that violation renders all of his post-request statements inadmissible. Shabaz also argued that any waiver of his *Miranda* rights he might have made in the interview room was not knowing and voluntary.

The suppression motion was heard by a magistrate judge, who held an evidentiary hearing and recom-

mended that the district court find that the Government had met its burden of showing by a preponderance of the evidence that Shabaz had knowingly and voluntarily waived his *Miranda* rights before his confession. First, the magistrate judge found that the officers did not violate Shabaz's rights at the time of the arrest, because he was not questioned nor did he give statements at that time. Second, the judge credited Shabaz's testimony that he asked Agent Watson, "[A]m I going to be able to get an attorney?" prior to entering the interview room. The judge, however, did not interpret Agent Watson's response as an outright denial. Instead, the judge found, when Agent Watson responded by directing Shabaz to the interview room, the agent was merely deferring an answer to the question for a couple of minutes (during which no interrogation took place). At that point, the judge chose to credit the accounts of the Government's witnesses and to reject Shabaz's version. This led to the judge's finding that Shabaz knowingly and voluntarily waived his *Miranda* rights once he was in the interview room and he began to talk. On review, the district court accepted the magistrate judge's report and recommendation and denied the motion to suppress.

On appeal, Shabaz argues only that the district court erred when it denied his motion to suppress for two reasons: first, because the agents wrongfully denied his request for an attorney, and second, because any waiver of his *Miranda* rights that may have occurred was not knowing and voluntary.

### III

Shabaz first argues that the district court erred in denying his motion to suppress because he unambiguously requested an attorney when he asked, "[A]m I going to be able to get an attorney?" Shabaz regards this statement as sufficient, as a matter of law, to invoke his *Miranda* rights. Central to *Miranda*'s holding is that law enforcement officers are obliged to inform an accused who is subject to custodial interrogation that she has the right to consult an attorney and to have an attorney present during questioning. *Miranda,* 384 U.S. at 471-72; *Davis v. United States*, 512 U.S. 452, 457 (1994). If a suspect invokes her *Miranda* rights, she "is not subject to further interrogation by the authorities until counsel has been made available . . . unless the accused [herself] initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

The key issue in this case is whether Shabaz clearly invoked his right to counsel. Whether an accused did so is an objective inquiry. If the suspect makes a reference to an attorney that is ambiguous "in that a reasonable officer in light of the circumstances would have understood that the suspect *might* be invoking the right to counsel," it is not necessary for the authorities to cut off questioning. *Davis*, 512 U.S. at 459. Law enforcement officials are not under any obligation to clarify ambiguous statements made by an accused. *United States v. Muhammad*, 120 F.3d 688, 698 (7th Cir. 1997). The burden is instead on the suspect to make a "clear and

unambiguous assertion of his right to counsel to stop questioning." *United States v. Lee*, 413 F.3d 622, 625 (7th Cir. 2005). Nonetheless, if a suspect confesses after law enforcement officers have violated the requirements of *Miranda*, any inculpatory statement made by the suspect cannot be used against him at trial. *Id.*

Shabaz contends that the district court erred as a matter of law when it did not grant his motion to suppress because he clearly asked for an attorney before Agent Watson took him into the interview room. But this way of phrasing the question assumes the answer to the problem, which is whether the statement "am I going to be able to get an attorney?" was in fact an immediate request for counsel. Neither the magistrate judge nor the district court understood the question this way; they held instead that the question did not require an instant positive response and that Agent Watson simply deferred his answer until they were inside the room.

We agree with the district court that Shabaz's question was not a clear request for counsel under the circumstances. It falls short of other statements that we have characterized as unambiguous requests for counsel. Thus, in *Lord v. Duckworth* we mentioned a number of statements that we would consider an unequivocal and clear request for counsel, including: "I think I should call my lawyer"; "I have to get me a good lawyer, man. Can I make a phone call?"; and "Can I talk to a lawyer? At this point, I think maybe you're looking at me as a suspect, and I should talk to a lawyer. Are you looking at me as a suspect?" 29 F.3d 1216, 1221 (7th Cir. 1994)

(quoting cases from the Eleventh and Ninth Circuits regarding unambiguous invocation of the right to counsel). In *Lord*, in contrast, we decided that the defendant's statement "I can't afford a lawyer but is there anyway I can get one?" was not an unambiguous request for an attorney. *Id.* at 1220-21. The fact that Lord "did not pursue the matter any further" after his initial inquiry was an important factor in our determination. *Id.* at 1221. Similarly, in *United States v. Walker*, we held that the defendant's statement that "he wasn't sure whether he should talk to [the agent] because he was afraid it would piss his lawyer off" was not an unambiguous request for counsel where he later told police to "go ahead" with questioning. 272 F.3d 407, 413-14 (7th Cir. 2001). That was also the case in *United States v. Buckley*, where the defendant said, "I don't know if I need an attorney," but was soon thereafter read his *Miranda* rights. 4 F.3d 552, 558-59 (7th Cir. 1993). This was close to the statement that the Supreme Court evaluated in *Davis*, where it held that saying "maybe I should talk to a lawyer" was not sufficiently clear to alert a reasonable police officer that the defendant was requesting an attorney. 512 U.S. at 455, 458-62.

A common point among the statements that have been deemed insufficient is that they do not clearly imply "a present desire to consult with counsel . . . ." *Lord*, 29 F.3d at 1221. Shabaz's question is the same. The words "am I *going to be able* to get an attorney?" did not unambiguously indicate to Agent Watson that Shabaz was right then asking for an attorney. But our analysis does not end with words alone; as in our previous cases, we also

consider the circumstances in which the statement was made. The remainder of Shabaz's encounter with the agents supports our conclusion that he did not unambiguously request counsel. As soon as Shabaz was led into the interview room, he was read his *Miranda* rights and, at that point, he easily could have requested an attorney. Although he says that he in fact did so, the district court did not believe his account; instead, the court credited the FBI agents and the Oak Lawn police and found that he made no such request. That is the kind of credibility finding to which we defer. *Walker*, 272 F.3d at 414. On the record as it comes to us, therefore, Shabaz did not clearly request an attorney. After he was properly informed of his rights, he chose instead to talk to his interrogators and never followed up on his initial question in the hall. Under those circumstances, the officers were under no obligation to stop questioning Shabaz, and the district court properly denied his motion to suppress.

Shabaz's alternate claim is that even if his statement was not a clear and unambiguous request for an attorney, the district court erred in denying his motion to suppress his post-arrest statements because he did not knowingly and voluntarily waive his *Miranda* rights. We consider *de novo* whether Shabaz's *Miranda* waiver was knowing and voluntary, *United States v. Jackson*, 300 F.3d 740, 747-48 (7th Cir. 2002), but we review the district court's findings of fact and credibility determinations under the clear error standard, *Walker*, 272 F.3d at 411-12. Where a defendant makes a post-arrest statement, the Government bears the burden of proving that the state-

ment was made following a voluntary, knowing, and intelligent waiver, *Miranda*, 384 U.S. at 475, taking into account the totality of the circumstances, *Jackson*, 300 F.3d at 748. In making this determination, we look at factors such as the defendant's background and conduct, the duration and conditions of the interview and detention, the physical and mental condition of the defendant, the attitude of the law enforcement officials, and whether law enforcement officers used coercive techniques, either psychological or physical. *Id.*

At the suppression hearing, the magistrate judge heard testimony from Shabaz and at least five government witnesses. We have reviewed those accounts already. The magistrate judge made a credibility determination that despite Shabaz's failure to sign the waiver form, he was advised of his *Miranda* rights and voluntarily agreed to waive them. In fact, the magistrate judge specifically found that Shabaz had "hedged his bets" by talking and getting the benefit of cooperation while refusing to sign the waiver and thus enabling his subsequent claim of non-waiver of rights. The district court accepted the magistrate judge's findings and recommendations in their entirety. Based on those factual findings, we conclude too that Shabaz made a knowing and voluntary waiver of his *Miranda* rights.

We AFFIRM the judgment of the district court.