In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 16-3510 & 16-3518

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

VICENTE QUIROZ,

*Defendant-Appellant.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 13 CR 21; 13 CR 968 — **Thomas M. Durkin**, *Judge*.

ARGUED SEPTEMBER 8, 2017 — DECIDED OCTOBER 26, 2017

Before MANION, KANNE, and HAMILTON, *Circuit Judges*.

KANNE, *Circuit Judge*. Defendant-Appellant Vicente Quiroz brokered large drug transactions. For his role in a methamphetamine transaction, he was convicted after a bench trial in January 2015. (Case No. 16-3518.) Then, in a second trial in July of that year, he was convicted by a jury for his role in a marijuana transaction. (Case No. 16-3510.)

Before both trials, Quiroz moved to suppress statements he made after his arrest, arguing that he was not read his *Miranda* warnings. The district court found that the warnings were given and that Quiroz voluntarily waived his rights. It admitted into evidence Quiroz's statements in both trials.

The district court also admitted several out-of-court statements at both trials. It admitted recorded conversations between Quiroz and the government's confidential informant. And it admitted recordings of other declarants under the hearsay exception for coconspirator statements.

In this consolidated appeal from his convictions in both trials, Quiroz argues that the district court improperly admitted his own post-arrest statements and the out-of-court statements of the confidential informant and coconspirators. We disagree, so we affirm both of Quiroz's convictions.

## I. BACKGROUND

In 2011, Benjamin Vance met Vicente Quiroz. In May 2012, Vance was arrested by the Drug Enforcement Agency ("DEA") for trafficking in cocaine and began cooperating with the government. In a series of recorded phone calls from October 2012 through January 2013, Vance and Quiroz arranged the purchase of approximately 70 pounds of methamphetamine and approximately 1,200 pounds of marijuana. Quiroz brokered the transactions, setting Vance up with the sellers.

### A. Investigation and Arrest of Quiroz

In October 2012, Quiroz told Vance that he had arranged for two suppliers to deliver 50 pounds of methamphetamine to Vance. Under the DEA's direction, Vance told Quiroz that he knew a pilot who could pick up the methamphetamine in

Indio, California. Quiroz responded that he would send a courier named Javier to deliver the methamphetamine to Vance's pilot and gave Vance that courier's phone number. On October 10th, an undercover DEA agent posed as the pilot and called that number. His call was returned by a man who identified himself as Javier. Javier agreed to meet the agent at a McDonald's, where he delivered a box containing 10 packages of methamphetamine totaling nearly 22 pounds in weight. The DEA surveilled the encounter.

About a week later, Quiroz asked Vance if he wanted to pick up more methamphetamine in the Chicagoland area, giving him the number of a courier named Cesar. Cesar and Vance arranged to meet in the parking lot of Rivers Casino near O'Hare airport. Under DEA surveillance, Vance went to the parking lot wearing a recording device. There, Cesar took a box from his car and placed it into Vance's vehicle. That box contained 22 packages of methamphetamine totaling about 44 pounds in weight.

In January 2013, Quiroz told Vance that he had an available marijuana delivery and that he would give the courier, later identified as Hector Barraza, Vance's number. Vance and Barraza arranged the delivery, and they met at a McDonald's outside Berwyn, Illinois. Vance asked to see the marijuana before he agreed to purchase it. Barraza indicated the marijuana was nearby, and the two then met at a Denny's restaurant under DEA surveillance. Barraza delivered a black bag of marijuana to Vance, then left to get the rest. The DEA arrested Barraza after he returned to the Denny's parking lot in a van containing 202 cylinders of marijuana totaling about 1,200 pounds in weight.

On March 27, 2013, DEA Agents Christopher O'Reilly and David Brazao arrested Quiroz outside his mother's home in Phoenix, Arizona. The officers placed him in the back seat of Agent O'Reilly's car while the agents conducted a protective sweep of the home with Quiroz's consent. After the security search, Agent O'Reilly read Quiroz his *Miranda* rights, reciting them partly from his *Miranda* card and partly from his own memory. According to Agent O'Reilly's testimony, Quiroz did not seem confused in any way or ask any questions; he was nervous but "seemed to understand everything [the agents] were saying." (Bench Trial R. 204 at 39.) When asked if he understood the rights that had just been read to him, Quiroz responded, "I did nothing." (*Id.* at 38, 73.)

Agents O'Reilly and Brazao then explained their investigation and told him about the phone recordings they had acquired. Quiroz then made inculpatory statements. The agents transported Quiroz to the DEA office in Phoenix. There, Quiroz told agents he would not sign any *Miranda* waiver or other paperwork, but he continued to engage with the agents and made more inculpatory statements.

B.  *Admission of Quiroz's Post-Arrest Statements*

At the final pretrial conference before the bench trial, Quiroz told the district court, "I never got my *Miranda* rights written. I never signed a waiver so that person can come and say, 'He made a statement.'" (Bench Trial R. 154 at 26.) The government then told the court that Quiroz had been orally advised of his *Miranda* rights, to which Quiroz responded, "[T]hey've never read me my *Miranda* rights." (*Id.* at 30.) The district court decided to hold a suppression hearing. Agent O'Reilly was the only government witness; Quiroz did not present any evidence.

The district court found that Quiroz waived his *Miranda* rights. The court credited Agent O'Reilly's testimony that Quiroz was in fact read his *Miranda* warnings. It went on to find that Quiroz's statement—"I did nothing"—was a voluntary, knowing, and intelligent waiver of his rights. Accordingly, it admitted Quiroz's post-arrest statements at his bench trial.

Shortly before the jury trial, Quiroz again moved to suppress the statements for the same reason as before. The government and Quiroz both indicated that the evidence at the hearing would be the same as it was before. Thus, the district court again denied the motion to suppress and admitted the statements at Quiroz's jury trial.

### C. *Admission of Other Out-of-Court Statements*

As is often the case in drug prosecutions, the government wished to introduce statements at Quiroz's trials made by its informant (Vance) and Quiroz's alleged coconspirators (Javier and Cesar in the bench trial, and Barraza in the jury trial).

In order to offer coconspirator statements, the government was preliminarily required to show by a preponderance of the evidence that (1) a conspiracy existed, (2) Quiroz and the declarant were members of that conspiracy, and (3) the proffered statements were made in furtherance of that conspiracy. *United States v. Davis*, 845 F.3d 282, 286 (7th Cir. 2016); *United States v. Santiago*, 582 F.2d 1128, 1134–35 (7th Cir. 1978). The government was permitted to present this evidence by submitting a *Santiago* proffer before trial, and it did so.

Before the bench trial, the court reserved ruling on the admissibility of Javier and Cesar's coconspirator statements until the government finished presenting its evidence at trial.

The court indicated that it would, at the close of the government's case, strike such testimony if it found that the government had not met its evidentiary burden. At trial, the district court ruled that the government had met its burden and did not strike any testimony.

Quiroz also moved before the bench trial "to preclude the prosecution from introducing any and all hearsay not substantiated by the Court." (Bench Trial R. 204 at 107.) The district court denied the motion but preserved Quiroz's ability to object at trial to any hearsay offered. No objection was made to Vance's out-of-court statements at trial, and they were admitted.

Before the jury trial, the court indicated that it would admit the statements of both Vance and Barraza but would hear objections or motions to strike at trial if necessary. Quiroz made neither, and the out-of-court statements of both men were admitted.

*** 

After the bench trial, the district court convicted Quiroz of the methamphetamine charges. At a second trial a few months later, a jury convicted Quiroz of the marijuana charges. The court sentenced Quiroz to 180 months' imprisonment in each case, to run concurrently, a sentence below his guidelines range. This consolidated appeal followed.

## II. ANALYSIS

Quiroz has two general concerns on appeal. First, he argues that the district court erred in admitting his post-arrest statements because he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights. He believes that their

admission was non-harmless error in both trials, requiring reversal of both convictions.

Second, he argues that the district court abused its discretion in admitting Vance's out-of-court statements in both trials, Cesar's in the bench trial, and Barraza's in the jury trial. He believes that the admission of this evidence was also non-harmless error that mandates reversal.

We take each argument in turn and discuss additional facts as necessary.

### A. *Voluntary, Knowing, and Intelligent Waiver of Rights*

A defendant's waiver of *Miranda* rights must always be voluntary, knowing, and intelligent. *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *United States v. Carson*, 582 F.3d 827, 833 (7th Cir. 2009). Whether a person has validly waived his *Miranda* rights depends on the totality of the circumstances, *United States v. Shabaz*, 579 F.3d 815, 820 (7th Cir. 2009), and the government must prove a valid waiver by a preponderance of the evidence, *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). Courts typically look at such factors as "the defendant's background and conduct, the duration and conditions of the interview and detention, the physical and mental condition of the defendant, the attitude of the law enforcement officials, and whether law enforcement officers used coercive techniques." *Shabaz*, 579 F.3d at 820.

We review the ultimate issue of the voluntariness of a *Miranda* waiver *de novo*. *United States v. Jackson*, 300 F.3d 740, 747–48 (7th Cir. 2002) (citing *United States v. Smith*, 218 F.3d 777, 780 (7th Cir. 2000)). But we review the trial court's factual findings with respect to the facts on which the voluntariness claim was based for clear error. *United States v. Walker*, 272 F.3d 407,

412 (7th Cir. 2001); *United States v. Brooks*, 125 F.3d 484, 491 (7th Cir. 1997) (citation omitted).

Here, the district court denied Quiroz's motions to suppress his statements because he implicitly waived his rights. We review this determination *de novo*, using the district court's findings of fact and credibility determinations because they are neither clearly erroneous nor argued to be so.

To be sure, implicit waivers can be knowing, intelligent, and voluntary. So long as the government can prove that the defendant understood his rights, voluntarily speaking without a lawyer present constitutes a valid waiver. *See Berghuis v. Thompkins*, 560 U.S. 370 (2010). *Thompkins* requires the government to show that (1) warnings were given, (2) the accused made an uncoerced statement, and (3) the accused understood his rights. *Id.* at 384. Showing that the warnings were given and that the accused then made an uncoerced statement is insufficient to show a valid waiver. *Id.* The government must make the additional showing of understanding. *Id.*

Quiroz argues that the district court erred when it found that he understood his rights.

After the agents asked if Quiroz understood his rights that had been read to him, he responded ambiguously: "I did nothing." Nonetheless, the district court found that the totality of the circumstances demonstrated by a preponderance of the evidence that Quiroz understood his rights. Though the district said, "I find it's an implied waiver when you talk after you've been told you don't have to talk," (Bench Trial R. 204 at 101), it also discussed other relevant facts that it believed demonstrated Quiroz's understanding. Those facts are detailed below in our own analysis.

On review, we agree with the district court's conclusion. The totality of the circumstances in the record shows that Quiroz understood his rights even though he did not explicitly acknowledge that understanding.

First, Quiroz is an intelligent individual who understands English and "use[s] words and sentences that are entirely consistent with the intelligence a person would need to understand the words read to him by the agent relating to his *Miranda* rights." (*Id.* at 101–02.) Further, the district court found that Agent O'Reilly was credible, and he testified in part that Quiroz "seemed to understand everything [the agents] were saying." (*Id.* at 39, 102.) *See Shabaz*, 579 F.3d at 820 (indicating that courts can consider the defendant's background and mental condition).

Second, Quiroz was not "a timid person in asserting his rights relating to trial procedures and certainly discovery obligations," indicating that he had at least some knowledge of the system. (Bench Trial R. 204 at 94.) *See United States v. Brown*, 664 F.3d 1115, 1118 (7th Cir. 2011) (noting that the defendant's knowledge of the criminal justice system is a relevant factor). The record supports this statement. For example, Quiroz told the agents that he wouldn't sign anything but continued talking freely, telling them that that he could help them but he would need to be on the street to do so. (Bench Trial R. 204 at 42, 65.) Then, after the court told Quiroz that only constitutional violations were bases for suppressing his statements, he asked the court to suppress his statements because he did not sign the *Miranda* waiver form. (*Id.* at 25–26.) When this didn't work to secure him a suppression hearing, he told the court that he hadn't been informed of his *Miranda* warnings at all. (*Id.*) *See also Shabaz*, 479 F.3d at 820 (finding

that defendant understood his rights when he tried to "'hedge[] his bets' by talking and getting the benefit of cooperation while refusing to sign the waiver and thus enabling his subsequent claim of non-waiver of rights").

And third, the agents asked for and received Quiroz's consent for a protective sweep of the property; it wasn't until the search was complete that they began questioning him. (Bench Trial R. 204 at 33–34.) *See Shabaz*, 579 F.3d at 820 (indicating that courts can consider the conditions surrounding the interview and the law enforcement officials' attitudes).

We reject Quiroz's argument that we must reach a different conclusion under our prior decision in *United States v. Brown*. There, the court assumed that the defendant had ambiguously acknowledged that he understood his rights but nonetheless found that there was sufficient evidence he understood: Brown had substantial experience with the criminal justice system, he negotiated with investigators for a deal, and he selectively chose which questions to answer during interrogation. *See Brown*, 664 F.3d at 1118. Quiroz believes that these factors are required to be present in cases where a defendant does not explicitly indicate that he understands his rights.

But this approach is antithetical to the well-settled principle that courts should consider the totality of the circumstances in determining whether there was a valid waiver. *Brown* did not displace this general rule; it applied it. *See id.* ("Looking at the totality of the circumstance[s], we feel it is clear that Brown understood and waived his rights."). If anything, *Brown* supports our conclusion that the totality of the circumstances can support finding that a defendant understood his rights even if he does not explicitly say so.

The totality of the circumstances shows that it is more likely than not that Quiroz understood his rights. For that reason, his uncoerced statement after he was read his rights constituted a valid implicit waiver. Thus, the court did not err when it allowed the government to introduce Quiroz's inculpatory statements in both trials.

### B. *Admission of Other Out-of-Court Statements*

We turn next to the district court's admission of other out-of-court statements. We review the admission of evidence for an abuse of discretion and "will reverse an evidentiary ruling only when the record contains no evidence on which the district court rationally could have based its ruling." *United States v. Gorman*, 613 F.3d 711, 717 (7th Cir. 2010). But when a defendant fails to object to an evidentiary error, we review for plain error. *United States v. Ambrose*, 668 F.3d 943, 963 (7th Cir. 2012). This is an exceedingly deferential standard, and one under which we will reverse in only the most exceptional of circumstances. *See Lieberman v. Washington*, 128 F.3d 1085, 1095 (7th Cir. 1997).

In both trials, the government introduced out-of-court statements by its confidential informant, Vance, and those made by alleged coconspirators. In the bench trial, those coconspirators were Javier and Cesar, the two couriers in the methamphetamine transactions. In the jury trial, that coconspirator was Barraza, the courier in the marijuana transaction. Quiroz argues that Vance's, Cesar's, and Barraza's statements should not have been admitted.

### 1. *Vance's Statements*

The district court admitted recordings of Vance speaking with Quiroz, Cesar, and Barraza at Quiroz's trials. Before his

bench trial, the district court preserved Quiroz's ability to object to any hearsay offered. Further, at the bench trial, the district court gave Quiroz the opportunity to object to Vance's statements at the close of the government's evidence. He did not object to the statements. Then, before the jury trial, the court indicated it would admit Vance's statements but preserved Quiroz's ability to move to strike testimony. He did not. In both cases, then, the court invited Quiroz to object or move to strike at trial, and he didn't. Thus, we review for plain error.

The government agrees that these statements could not be properly admitted under Rule 801(d)(2)(E) because Vance was not a coconspirator. *See United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993) (holding that 801(d)(2)(E) does not apply in cases where there is a single criminally motivated person and a government informant because a conspiracy cannot exist between them).

Instead, the government contends that Vance's out-of-court statements were not introduced for the truth of the matter asserted but "to put [Quiroz's] own words in context and to help the jury make sense out of his reaction to what [Vance] said and did." *United States v. Gaytan*, 649 F.3d 573, 580 (7th Cir. 2011); *see also United States v. Foster*, 701 F.3d 1142, 1150 (7th Cir. 2012) ("The admission of recorded conversations between informants and defendants is permissible where an informant's statements provide context for the defendant's own admissions."). We agree that Vance's statements to Quiroz were admissible for this purpose, and so the court did not plainly err in admitting them.

Vance's recorded statements in conversations with Cesar and Barraza also fall within this context rule. The statements

of nonconspirators may be admitted "to give *context* to the coconspirators' ends of the conversations," even when being introduced against a conspirator not included in the conversation. *United States v. Zizzo,* 120 F.3d 1338, 1348 (7th Cir. 1997). To be sure, the *Zizzo* court instructed the jury that the informant's statements could not be used for their truth. It was careful to admit only the statements that the coconspirators were in a position to deny or adopt based on information that they had learned from sources other than the informant. But Quiroz did not object to these statements, and "the failure of the trial court to give limiting instructions on the use of hearsay statements at the time of their admission does not constitute plain error mandating reversal." *United States v. Fleming*, 594 F.2d 598, 606 (7th Cir. 1979).

### 2. *Coconspirator Statements of Cesar and Barraza*

The district court admitted Cesar's and Barraza's statements under Rule 801(d)(2)(E). The rule provides that a statement offered against a party is not hearsay if the statement is made by a coconspirator of that party during the course, or in furtherance, of the conspiracy.

Before admitting evidence under Rule 801(d)(2)(E), the court must find by a preponderance of the evidence (1) that a conspiracy existed, (2) that the declarant was a member of the same conspiracy as the defendant, and (3) that the statement was made in furtherance of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987). A district court's factual determination as to the existence of these elements is reviewed for clear error. *United States v. Hogan*, 886 F.2d 1497, 1504 (7th Cir. 1989).

A conspiracy exists when there is "an agreement to commit some illegal act and [when] the alleged coconspirator knew 'something of its general scope and objective though not necessarily its details.'" *Mahkimetas*, 991 F.2d at 382 (quoting *United States v. Cerro*, 775 F.2d 908, 911 (7th Cir. 1985)). The court "may examine the hearsay statements sought to be admitted" and give the evidence "such weight as … judgment and experience counsel." *Bourjaily*, 483 U.S. at 175. But we have required some evidence independent of the out-of-court statement itself to corroborate the conspiracy's existence. *United States v. Lindemann*, 85 F.3d 1232, 1239 (7th Cir. 1996).

Quiroz believes that the district court clearly erred when it found that there was a conspiracy between Quiroz and Cesar and Quiroz and Barraza because the government offered insufficient evidence independent of the statements themselves to corroborate the conspiracy's existence. (Appellant's Br. at 28–30.) The record indicates otherwise.

In admitting Cesar's statements in the bench trial, the district court considered Vance's in-person testimony about conversations with Cesar and recorded conversations where Quiroz himself confirmed the methamphetamine delivery after it occurred as corroborating evidence. (Bench Trial R. 207 at 102.) It indicated that "the admissions of the defendant himself without even taking into account the statements of [Cesar] … establish a conspiracy." (*Id.*)

In admitting Barraza's statements in the jury trial, the court found that the government's *Santiago* proffer satisfied its burden. It believed that Quiroz's statements, together with the hearsay statements sought to be admitted, estab-

lished that a conspiracy existed between Quiroz and Barraza. (Jury Trial R. 217 at 79.) For example, the proffer indicated that Quiroz told Vance that a person would be calling on behalf of "Midget," and then a call came later from Barraza, who said he was calling on behalf of Midget. (Jury Trial R. 121 at 18.) There were also recorded meetings between Vance and Quiroz in which Quiroz described the quality of the marijuana that he expected to be delivered by the courier (later identified as Barraza). (*Id*. at 19.) The court went on to say that if the evidence did not comport with what was proffered, the court would consider a motion to strike. (Jury Trial R. 217 at 80.) Quiroz made no such motion.

The district court was permitted to consider the out-of-court statements themselves, so long as it had some independent evidence of the conspiracy. In both cases, it did. Its finding of a conspiracy was not clearly erroneous, and it did not abuse its discretion in admitting the statements.

### 3. *Harmless Error*

As a final note, even if the district court had committed any error in admitting Vance's, Cesar's, or Barraza's statements, it would have been harmless. Harmless errors are those that do not have an effect on the outcome because the case against the defendant is so overwhelming absent the erroneously admitted evidence. *See, e.g., United States v. Lee*, 413 F.3d 622 (7th Cir. 2005); *United States v. Westmoreland*, 240 F.3d 618 (7th Cir. 2001). This is the case here.

Quiroz's post-arrest statements were properly admitted. There was also testimony from two sources that it was Quiroz's voice on the recordings, and those statements were properly admitted as admissions of a party-opponent. And

Vance testified in both trials. This evidence made the government's case against Quiroz overwhelming. Even without the recorded statements of Vance, Cesar, and Barraza, the outcome would have been the same.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgments of conviction in case numbers 16-3510 and 16-3518.