In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 22-1793
UNITED STATES OF AMERICA,
 Plaintiﬀ-Appellee,
 v.

MARIO OLIVAS BAILON,
 Defendant-Appellant.
 ____________________

 Appeal from the United States District Court for the
 Northern District of Illinois, Eastern Division.
 No. 20 CR 601 — Mary M. Rowland, Judge.
 ____________________

 ARGUED JANUARY 6, 2023 — DECIDED FEBRUARY 23, 2023
 ____________________

 Before EASTERBROOK, ST. EVE, and KIRSCH, Circuit Judges.
 ST. EVE, Circuit Judge. Mario Olivas Bailon accompanied a
friend on a road trip from Aurora, Illinois to Chicago for a
drug transaction. At the meetup point, agents from the Drug
Enforcement Agency (“DEA”) arrested the individuals in-
volved in the drug deal, including Olivas Bailon, and
searched the vehicle, ﬁnding a .38-caliber pistol on the ﬂoor of
the car. Olivas Bailon was charged with being an alien unlaw-
fully in the United States in possession of a ﬁrearm in
2 No. 22-1793

violation of 18 U.S.C. § 922(g)(5). He ﬁled a motion to sup-
press the incriminating statements he made to DEA agents,
which the district court granted in part and denied in part.
The parties consented to a bench trial, and the district court
found Olivas Bailon guilty. He now appeals the district
court’s partial denial of his motion to suppress.
 I. Background
 In 2020, Mario Olivas Bailon was an unauthorized immi-
grant residing in Aurora. On August 6, he accompanied a
friend named Ricardo Aguila on a road trip from Aurora to
Chicago, where Aguila had arranged to purchase seventeen
kilograms of cocaine. Unbeknownst to them, the individual
with whom Aguila arranged to meet was a conﬁdential source
for the DEA.
 After arriving at the agreed-upon location, Aguila showed
the conﬁdential source cash for the drugs. DEA agents then
arrested Aguila and Olivas Bailon and searched Aguila’s car,
recovering a .38-caliber pistol from the ﬂoor in front of the
rear passenger seat. The agents placed Olivas Bailon inside a
DEA van, and DEA Special Agent Gildein began questioning
Olivas Bailon about his involvement in the drug transaction
and about the gun. Although the conversation was con-
strained by Olivas Bailon’s limited English skills, Olivas
Bailon explained Aguila, who was his friend, had asked him
to join him on a drive to Chicago. Olivas Bailon further admit-
ted he owned the handgun found inside Aguila’s car. Gildein
did not share the contents of this conversation with any other
DEA agent.
 The agents transported Olivas Bailon to the Chicago DEA
oﬃce and placed him in an interrogation room. Three DEA
No. 22-1793 3

oﬃcials—Boone, Glomb, and Vazquez—then questioned
him. Although a Spanish interpreter was not in the room,
Vazquez spoke Spanish and translated for Olivas Bailon. At
the beginning of the interview, Olivas Bailon informed the
agents that he had a limited understanding of English but that
he could speak and read Spanish. The agents asked Olivas
Bailon to read an “Advice of Rights” form written in Spanish,
which stated:
 You have the right to remain silent. Anything you say
 may be used against you. Before continuing or answer-
 ing any question, you have the right to consult an at-
 torney. You have the right to have an attorney present
 during an interrogation. If you can’t pay for an attor-
 ney, and if you want one, one will appear before you
 answer any questions.
 After Olivas Bailon read the form aloud, Vazquez asked
him, “Do you understand?” In response, Olivas Bailon ini-
tialed next to each of his rights. He also signed the form on
the bottom of the page under the section titled “Waiver of
Rights,” although he did not read that portion of the docu-
ment aloud. That section stated that Olivas Bailon had read
the rights laid out above, that he understood those rights, and
that he was prepared to answer questions without having an
attorney present. Vazquez and Glomb signed their names on
the form as witnesses.
 During the interview, Olivas Bailon admitted to being in
the country without authorization. He also told the oﬃcers
that he had seven children and that his wife and kids were at
his home. He consented to the oﬃcers searching his home for
drugs and other contraband, and he consented to a search of
his phone. The agents asked questions about Aguila’s drug
4 No. 22-1793

transaction and the gun recovered from the ﬂoor of the car,
but Olivas Bailon repeatedly denied knowing anything. At
one point, the agents asked him if he “want[ed] to go back to
Mexico or … tell [them] the truth.” They stated that they were
going to “call[] CBP and ICE” and that he was “going back to
Mexico, leaving behind [his] seven kids.”
 The agents then told Olivas Bailon that they would test the
gun for ﬁngerprints. After that, he admitted that he had
touched the gun and knew it was in the car. He explained that,
earlier that week, he had gone to a ﬁring range with another
friend. That friend had left the gun in Olivas Bailon’s van, and
Olivas Bailon decided to bring the gun when Aguila told him
that they were going to pick up some money. The agents
found a photo of a gun on Olivas Bailon’s cell phone and
questioned him about it. He stated that the gun was a .38 cal-
iber and that he had placed the gun on the ﬂoor of Aguila’s
car earlier that day.
 Olivas Bailon was charged with being an alien unlawfully
in the United States in possession of a ﬁrearm in violation of
18 U.S.C. § 922(g)(5). He moved to suppress the statements he
made in the DEA van and the DEA oﬃce, arguing that the
statements were made in violation of his Miranda rights. The
district court granted the motion in part and denied the mo-
tion in part, excluding the statements made in the van but not
those made in the DEA oﬃce. The court found that his con-
duct during the interrogation suggested that his Miranda
waiver was voluntary and that this ﬁnding was not under-
mined by the agents’ references to his children or his lack of
formal education. It further found that he knowingly and in-
telligently waived his rights because, prior to doing so, he
read a written Miranda form in his native language and his
No. 22-1793 5

conduct suggested that he understood the rights summarized
in the document.
 Olivas Bailon subsequently requested a bench trial, and
the government agreed. The district court found him guilty
and sentenced him to twenty-one months of imprisonment,
time served, and three years of supervised release. Olivas
Bailon appealed. He has since been released from the custody
of the Bureau of Prisons and removed to Mexico. 1
 II. Analysis
 “We review a district court’s denial of a motion to sup-
press under a dual standard, assessing conclusions of law de
novo and evaluating factual ﬁndings for clear error with spe-
cial deference granted to the court’s credibility determina-
tions.” United States v. Outland, 993 F.3d 1017, 1021 (7th Cir.
2021) (citation omitted). Olivas Bailon argues that the district
court violated his Miranda rights when it admitted the

 1 Olivas Bailon’s removal does not aﬀect his standing to appeal his

conviction. To meet the Article III standing requirements, “[a] convicted
person who already has served his sentence must point to ‘some concrete
and continuing injury,’ i.e., ‘some “collateral consequence” of the convic-
tion.’” United States v. Meza-Rodriguez, 798 F.3d 664, 667 (7th Cir. 2015)
(quoting Spencer v. Kemna, 523 U.S. 1, 7 (1998)). Olivas Bailon meets this
requirement because his § 922(g)(5) conviction makes him permanently
inadmissible to the United States. See id.; see also 8 U.S.C.
§ 1182(a)(9)(A)(ii)(II) (stating that noncitizens convicted of an aggravated
felony are permanently barred from reentering the United States); 8 U.S.C.
§ 1101(a)(43)(E)(ii) (categorizing § 922(g)(5) as an aggravated felony). Sep-
arately, his appeal is not moot because he remains on supervised release.
See United States v. Garcia-Garcia, 633 F.3d 608, 612 (7th Cir. 2011).
6 No. 22-1793

statements he made to agents during his interrogation at the
Chicago DEA oﬃce. 2
 “[B]efore law enforcement oﬃcers can interrogate a sus-
pect in custody, they must inform the suspect of his Miranda
rights.” United States v. Thurman, 889 F.3d 356, 364 (7th Cir.
2018); see also Miranda v. Arizona, 384 U.S. 436, 475 (1966). The
government must prove, by a preponderance of the evidence,
that the defendant made a voluntary, knowing, and intelli-
gent waiver. United States v. Quiroz, 874 F.3d 562, 567 (7th Cir.
2017). Accordingly, a defendant’s waiver of his Miranda rights
is valid if it is (1) “‘the product of a free and deliberate choice
rather than intimidation, coercion, or deception’ and is [(2)]
made knowingly and intelligently, ‘with a full awareness of
both the nature of the right being abandoned and the conse-
quences of the decision to abandon it.’” Outland, 993 F.3d at
1021 (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). Eval-
uating the totality of the circumstances, “we look at factors
such as the defendant’s background and conduct, the dura-
tion and conditions of the interview and detention, the phys-
ical and mental condition of the defendant, the attitude of the
law enforcement oﬃcials, and whether law enforcement

 2 Challenges to the admission of a defendant’s post-arrest statements

typically present two “distinct and separate inquir[ies]”: (1) whether he
knowingly, intelligently, and voluntarily waived his Miranda rights and
(2) whether his statements were made voluntarily. Outland, 993 F.3d at
1021. In his motion to suppress, Olivas Bailon argued that he did not val-
idly waive his Miranda rights. The district court ruled on the Miranda issue
alone. Although Olivas Bailon seems to conﬂate the voluntariness of the
statements and Miranda waiver analyses, his appeal focuses on the latter—
namely, whether he knowingly, intelligently, and voluntarily waived his
Miranda rights.
No. 22-1793 7

oﬃcers used coercive techniques, either psychological or
physical.” United States v. Shabaz, 579 F.3d 815, 820 (7th Cir.
2009).
A. Knowing and Intelligent Waiver
 The totality of the circumstances establishes that Olivas
Bailon knowingly and intelligently waived his rights. He
signed a Miranda waiver written in Spanish, his native lan-
guage, which accurately and clearly outlined his rights under
the law. The agents gave him the opportunity to read the form
before they began questioning him, and he ﬂuently read each
of his rights aloud before initialing next to each line. See
Berghuis v. Thompkins, 560 U.S. 370, 385–86 (2010) (ﬁnding that
the Miranda waiver was valid, in part, because the defendant
“was given time to read the warnings”). The agents commu-
nicated with Olivas Bailon in Spanish, with one agent trans-
lating for the others. Olivas Bailon also signed the bottom por-
tion of the document, titled “Waiver of Rights,” which stated
that he had read and understood his rights and was prepared
to answer questions without an attorney. Notably, the agents
did not use any force or threats to coerce him to sign the
waiver. Id. at 386 (ﬁnding that the defendant “d[id] not claim
that police threatened or injured him” nor “that he was in any
way fearful”). And he does not contend that he was intoxi-
cated or otherwise impaired when he read and signed the
form. See United States v. Mercado, 53 F.4th 1071, 1086 (7th Cir.
2022).
 The record supports the district court’s determination that
Olivas Bailon’s limited education and limited ability to speak
and understand English did not aﬀect his ability to under-
stand his Miranda rights. The Miranda waiver was printed in
Spanish, and one of the DEA agents spoke Spanish and
8 No. 22-1793

interpreted for the agents who did not. See Carrion v. Butler,
835 F.3d 764, 776 (7th Cir. 2016) (rejecting the defendant’s ar-
gument that his statements were involuntary because an
agent acted as a translator). Additionally, Olivas Bailon com-
municated intelligently in Spanish about the circumstances of
his arrest. See Quiroz, 874 F.3d at 568 (ﬁnding that the defend-
ant appeared to be “an intelligent individual” who “use[s]
words and sentences that are entirely consistent with the in-
telligence a person would need to understand … his Miranda
rights”).
 Olivas Bailon’s contention that his Miranda waiver was not
valid because he did not know why he was arrested or the
criminal charge for which he was being held fails. “The Con-
stitution does not require that a criminal suspect know and
understand every possible consequence of a waiver of the
Fifth Amendment privilege.” Colorado v. Spring, 479 U.S. 564,
574 (1987). Accordingly, the government was not obligated to
inform Olivas Bailon of the subject matter of the interrogation,
and this lack of knowledge did not make his waiver invalid.
Id. at 573 (upholding a Miranda waiver where the defendant
was unaware of the crime about which he would be ques-
tioned).
 Olivas Bailon further argues that his questioning in the
van prior to receiving Miranda warnings undermined the va-
lidity of his waiver. He does not fully develop this argument
or cite any authority supporting it. Nevertheless, we interpret
Olivas Bailon as invoking the Supreme Court’s decision in
Missouri v. Seibert, 542 U.S. 600, 604 (2004), where the oﬃcers
did not read the defendant Miranda warnings until after she
had confessed. In Seibert, the divided Court set out two tests
for determining whether a defendant’s post-warning
No. 22-1793 9

confessions are tainted by his pre-warning questioning. Id. at
615, 621. The plurality stated that the critical question in such
cases is “whether [the] Miranda warnings … could be eﬀective
enough to accomplish their object.” Id. at 615. In contrast, Jus-
tice Kennedy set out an intent-based test, which asks whether
the oﬃcers acted “deliberate[ly]” in employing the two-step
interrogation method. Id. at 622.
 Under either test, Olivas Bailon’s argument fails. There is
no evidence in the record to support a ﬁnding that the agents
deliberately withheld Miranda warnings to obtain a confes-
sion. Nor does the record support that his Miranda warnings
were not “eﬀective enough to accomplish their object.” The
interrogations were separated in time, took place in two dif-
ferent locations, and involved diﬀerent agents. Moreover, the
questioning in the DEA van was brief, the language barrier
between the agent and Olivas Bailon hindered meaningful
communication, and the contents of the conversation were
not disclosed to the agents who engaged in the interrogation
at the DEA oﬃce. This questioning therefore did not impact
the eﬀectiveness of his Miranda warnings.
B. Voluntariness of the Waiver
 The district court similarly did not err in determining that
Olivas Bailon voluntarily waived his Miranda rights. As the
district court noted, Olivas Bailon’s conduct during the inter-
rogation established that he validly waived his rights. After
signing the Miranda waiver written in his native language, he
immediately began answering the agents’ questions. See
United States v. Lee, 618 F.3d 667, 676 (7th Cir. 2010) (“Willing-
ness to answer questions, even in the absence of a signed
waiver, can be viewed as impliedly waiving one’s rights.”);
United States v. Smith, 218 F.3d 777, 781 (7th Cir. 2000) (noting
10 No. 22-1793

that the defendant, after being read her rights, “immediately
began talking to the agents … and continued to do so for an
hour”). He consented to the agents searching his phone and
home and expressed willingness to cooperate in exchange for
assistance with his case. See, e.g., Quiroz, 874 F.3d at 568 (hold-
ing that the defendant voluntarily waived his Miranda rights,
in part, because he consented to a protective sweep of his
property before the interview); Thurman, 889 F.3d at 364
(holding that the defendant impliedly waived his Miranda
rights because he “chose to speak with the oﬃcers in the hope
of obtaining leniency”). Additionally, Olivas Bailon showed
independent thinking during the interview, occasionally
denying the agents’ accusations and correcting their misun-
derstandings. See Smith, 218 F.3d at 782 (noting the defend-
ant’s “independent thinking and exercise of free will”); Qui-
roz, 874 F.3d at 568 (ﬁnding that the defendant was “not a
timid person in asserting his rights” (cleaned up)).
 The circumstances of the interrogation further support the
district court’s ﬁnding. Although there were three DEA
agents inside the room, the atmosphere of the interrogation
was “low key and informal.” Thurman, 889 F.3d at 365. The
oﬃcers were polite and respectful, no weapons were drawn,
and Olivas Bailon even laughed at times. The interview was
conducted during the middle of the afternoon and lasted
about an hour. See Berghuis, 560 U.S. at 386–87 (ﬁnding a valid
Miranda waiver where a three-hour “interrogation was con-
ducted in a standard-sized room in the middle of the after-
noon”).
 The record does not support Olivas Bailon’s arguments
that the agents made certain threats during the interrogation
that rendered his waiver involuntary. He claims that the
No. 22-1793 11

government made threats to his wife and children. Although
the government is permitted to discuss a defendant’s family,
it is not permitted to lie about or threaten his family to coerce
a waiver. See Janusiak v. Cooper, 937 F.3d 880, 891–92 (7th Cir.
2019); Lentz v. Kennedy, 967 F.3d 675, 691 (7th Cir. 2020). The
district court’s holding that the agents’ statements regarding
Olivas Bailon’s family did not overbear his will was not
clearly erroneous. Contrary to Olivas Bailon’s representa-
tions, the agents never made any threats or promises regard-
ing his family to induce a confession. In fact, the agents
brought up his children and wife only a couple of times dur-
ing the hour-long conversation. And when the agents did
mention his family, they stated only true facts regarding the
potential consequences of a conviction, for example, that he
would be unable to see them if he were deported and unable
to reenter the United States.
 Olivas Bailon’s additional argument that the agents’
“threats to deport him” rendered his waiver involuntary sim-
ilarly fails. To be sure, the agents stated on three occasions
that they would call “Immigration” or that he would “go back
to Mexico” if he did not tell the truth, but these statements
made up a small portion of the conversation. Olivas Bailon
continually denied owning the gun or knowing anything
about the gun, even after the agents told him that he was “go-
ing back to Mexico.” It was not until the agents informed Oli-
vas Bailon that they would test the gun for ﬁngerprints that
he admitted touching the gun and bringing it on the road trip
with Aguila.
 Considering the totality of the circumstances, the district
court did not clearly err in ﬁnding that Olivas Bailon’s
12 No. 22-1793

conduct and statements during the interview establish that he
voluntarily waived his Miranda rights.
 III. Conclusion
 The district court properly denied Olivas Bailon’s motion
to suppress his statements because he knowingly, intelli-
gently, and voluntarily executed a valid waiver of his Miranda
rights. For these reasons, the district court’s ruling is
 AFFIRMED.